**In the Matter of TELTRONICS SERVICES, INC. Bankrupt.**

**ANACONDA–ERICSSON, INC., successor by merger of LM Ericsson Telecommunications, Inc., Plaintiff,**

v.

**Jules J. HESSEN, as Trustee in Bankruptcy of Teltronics Services, Inc., Defendant.**

**Bankruptcy No. 79–B–2725 (CHG).
Adv. No. 79–B–2725 (CAP).**

United States Bankruptcy Court, E.D. New York.

April 5, 1983.

142

Sullivan & Cromwell, New York City, Richard G. Lyon, Greenwich, Conn., for plaintiff Anaconda-Ericsson, Inc.

Hahn & Hessen, New York City, for trustee.

## DECISION

C. ALBERT PARENTE, Bankruptcy Judge.

Plaintiff Anaconda-Ericsson, Inc. commenced an adversary proceeding against the bankrupt, Teltronics Services, Inc., seeking *inter alia* a declaration of its rights in certain assets of the bankrupt, and relief from the stay of enforcement of those rights. The trustee interposed various affirmative defenses and a counterclaim for equitable subordination.

In essence, the trustee contends that the plaintiff fraudulently induced Teltronics to default under a certain loan agreement, thereby enabling plaintiff to seize its collateral and take over the business of Teltronics. Conversely, plaintiff avers that its conduct toward the debtor was entirely within the bounds of lawful and reasonable commercial practice. After trial of the issues presented, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### THE PARTIES

1. Plaintiff Anaconda-Ericsson, Inc., a Delaware corporation, is the successor by merger to L M Ericsson Telecommunications, Inc. ("LMU"). The merger of LMU into plaintiff occurred on January 28, 1982. Pre-trial Order, Schedule C ¶ 1. (Hereinafter all references to "Schedule C" relate to the stipulated facts incorporated into the Pre-trial Order dated November 1, 1982.)

2. Prior to its merger with plaintiff, LMU was a New York corporation with its principal place of business at 100 Crossways Park West, Woodbury, Nassau County, New York, and before 1980 it was a wholly-owned subsidiary of Telefonaktiebolaget L M Ericsson ("LME"), a Swedish corporation. Schedule C, ¶ 1.

3. Between January 1, 1978, and March 31, 1979, the following individuals were officers, directors, or employees of LMU and certain of their positions were referred to internally by designations indicated in parentheses:

Joseph Amato, secretary and accounting manager

John Cody, accounting manager

Donald M. Costello, vice president and treasurer

Ronald E. Halvorsen, assistant to the president (LMUA)

Carl O. Lennmalm, director and vice-chairman of the board of directors

Sigge Malmstrom, president (LMUC) and director

Arne Stein, director

Carl-Henrik Strom, director

Schedule C, ¶ 2.

4. Between January 1, 1978, and March 31, 1979, Carl O. Lennmalm was also the president of The Ericsson Corporation, a wholly-owned subsidiary of LME with its principal place of business in New York, New York, and that position was referred to internally by the designation "TECC." Schedule C, ¶ 3.

5. LME is based in Stockholm, Sweden, and manufactures telephone equipment, including private automatic branch exchanges ("PABXs"). Schedule C, ¶ 4.

6. Between January 1, 1978, and March 31, 1979, the following individuals were officers or employees of LME and their positions were referred to internally by the designations indicated in parentheses:

Lars Edmark, vice president (FD)

Rolf Eriksson, vice president (GC)

Bengt Lilliecreutz (Dfe)

Jorgen Lind, internal auditor (DrU)

Bjorn Lundvall, chairman of the board (OF)

Fritz Staffas, vice president (ED)

Arne Stein, management consultant (DO)

Jan Stenberg, vice president and chief legal officer (JD)

Carl-Henrik Strom, chief engineer (DfE)

Bjorn Svedberg, president (VD)

Schedule C, ¶ 5.

7. Teltronics Services, Inc. ("Teltronics") is a New York corporation, organized in

May 1970, that began its operations in July 1971. Teltronics became a publicly-owned corporation in 1973. Prior to March 6, 1979, Teltronics' shares were publicly traded in the over-the-counter market. Schedule C, ¶¶ 6, 7; exh. T–321D at 1, T–342 at 5.

8. The parties have stipulated that "[f]rom prior to 1975 until subsequent to June 17, 1975, Teltronics had its principal place of business at 306 East 39th Street, New York, New York County, New York. From prior to December 30, 1975, until subsequent to March 1979, Teltronics had its principal place of business at 48–40 34th Street, Long Island City, Queens County, New York." Schedule C, ¶ 6.

9. From January 1, 1978, to March 31, 1979, the following individuals were officers or employees of Teltronics:

Edward Antico

Edward M. Beagan, president and chairman of the board

Robert M. Chanda, corporate vice president (from October 1978 to March 6, 1979)

Michael Cheng

Donald M. Kleban, vice president and general counsel (until March 6, 1979)

Randolph K. Piechocki, vice president

Daniel Smith, vice president

Schedule C, ¶ 8.

10. Prior to March 6, 1979, Teltronics acted as an independent distributor of business telephone equipment manufactured by LME. Teltronics purchased such equipment from LMU and, in turn, sold or rented such equipment to Teltronics' customers, who were the users thereof. Teltronics was LMU's principal distributor of PABX equipment for the New York metropolitan area. Schedule C, ¶¶ 10, 11.

11. Since May 1980, Jules J. Hessen has been and now is the duly qualified and acting trustee in bankruptcy of Teltronics. Schedule C, ¶ 9.

## JURISDICTION

12. On September 18, 1979, four creditors of Teltronics, including LMU, filed an involuntary bankruptcy petition against Teltronics in this court under section 59(b) of the Bankruptcy Act of 1898. On September 28, 1979, Teltronics filed a voluntary petition in this court seeking relief under Chapter XI of the Bankruptcy Act. Pursuant to Bankruptcy Rule 11–44(a), LMU was thereupon automatically stayed from acting or proceeding to enforce its claimed security interest in certain of Teltronics' assets.

13. On October 16, 1979, LMU filed its complaint in the instant adversary proceeding, seeking: (1) relief from the stay, (2) a declaratory judgment as to the enforceability of its claimed rights in certain collateral, (3) an injunction, (4) an accounting, and (5) ancillary relief.

14. On April 30, 1980, Teltronics was adjudicated a bankrupt. Pursuant to Bankruptcy Rule 601, LMU continued to be stayed from acting or proceeding to enforce its claimed security interest.

15. The trustee was subsequently appointed and he qualified on May 20, 1980.

16. Pursuant to a stipulation between LMU and the trustee dated June 27, 1980 and approved by Bankruptcy Judge Cecelia H. Goetz of this court on July 8, 1980, the trustee served an answer to LMU's complaint, asserting affirmative defenses and a counterclaim for equitable subordination of LMU's claim. The trustee's answer also sought dismissal of LMU's complaint, the imposition of a constructive trust upon monies and property already received by LMU and ancillary legal and equitable relief.

17. On March 20, 1981, Judge Goetz granted motions by LMU respectively for summary judgment and dismissal of the trustee's equitable subordination counterclaim. *L M Ericsson Telecommunications, Inc. v. Teltronics Services, Inc.*, Adv. No. 79–B–2725 (Bkrtcy.E.D.N.Y.), *rev'd & remanded,* 18 B.R. 705 (D.C.E.D.N.Y.1982). Judge Goetz's decision, which was predicated in part on the *res judicata* effect of the prior dismissals of two securities and antitrust actions brought by Teltronics against LMU *et al.* in the District Court for the Southern District of New York, *Teltronics Services, Inc. v. L M Ericsson Telephone Co.*, No. 79 Civ. 1233 (S.D.N.Y.1979); *Tel-*

*tronics Services, Inc. v. L M Ericsson Telecommunications, Inc.*, 486 F.Supp. 836 (S.D. N.Y.), *aff'd*, 642 F.2d 31 (2d Cir.), *cert. denied*, 452 U.S. 960, 101 S.Ct. 3108, 60 L.Ed.2d 971 (1981), was reversed and remanded by District Court Judge Edward R. Neaher. 18 B.R. 705 (D.C.E.D.N.Y.1982.)

18. On April 9, 1982, Judge Goetz recused herself from the trial of this adversary proceeding. The adversary proceeding was thereafter reassigned for all purposes to Bankruptcy Judge C. Albert Parente.

19. Pursuant to section 2(7) of the Bankruptcy Act, this court has jurisdiction to determine all controversies relating to the collection, liquidation, and distribution of a bankrupt estate and the court may exercise summary jurisdiction over any controversy arising in a proceeding under the Act if no party objects to its exercise of such jurisdiction prior to the expiration of his time to answer. In this adversary proceeding no party has objected to this court's exercise of its summary jurisdiction. Pre-trial Order, Schedule B.

## FINANCING PROVIDED TO TELTRONICS BY LMU

20. Commencing in April 1975, LMU guaranteed a series of loans, aggregating in excess of $7.5 million, that were made to Teltronics by Citibank, N.A. ("Citibank"), and Nordic American Banking Corporation ("Nordic"). Schedule C, ¶ 17. The primary purpose of these loans was to provide Teltronics with sufficient capital to purchase PABX equipment from LMU, which it would in turn lease or sell to its customers. Tr. 225.2–226.15 (SGM).

21. Teltronics entered into a loan agreement with Citibank dated as of April 15, 1975, which was subsequently amended by agreements dated December 31, 1975, June 24, 1976, April 15, 1977, December 28, 1977, March 24, 1978, and April 26, 1978 (as amended, the "Citibank Loan Agreement"). Schedule C, ¶ 18.

22. Under the Citibank Loan Agreement, Teltronics executed a promissory note payable to Citibank, dated April 28, 1977, in principal amount of $3.7 million (the "Citibank Note"). Schedule C, ¶ 19.

23. LMU guaranteed payment of principal and interest under the Citibank Loan Agreement by a guarantee dated June 23, 1975, as subsequently amended. Schedule C, ¶ 20.

24. The principal amount outstanding on March 6, 1979, under the Citibank Loan Agreement was $3,063,574. Schedule C, ¶ 21.

25. Teltronics entered into loan agreements with Nordic dated August 29, 1977, October 6, 1977, and May 1, 1978. These agreements are referred to, respectively, as the First, Second, and Third Nordic Agreements. Schedule C, ¶ 22.

26. In connection with the First, Second, and Third Nordic Agreements, Teltronics executed the following promissory notes in favor of Nordic: (1) A note dated December 15, 1978, in the amount of $700,000, under the First Nordic Agreement; (2) A note dated December 28, 1977, in the amount of $2 million, under the Second Nordic Agreement; (3) A note dated March 6, 1978, in the amount of $800,000, under the Second Nordic Agreement; and (4) A note dated May 1, 1978, in the amount of $1 million, under the Third Nordic Agreement (collectively, the "Nordic Notes"). Schedule C, ¶ 23.

27. By guarantees dated August 31, 1977, December 28, 1977, and May 1, 1978, LMU guaranteed payment of principal and interest under each of the Nordic Notes. Schedule C, ¶ 24.

28. Teltronics' indebtedness to Nordic under the First, Second, and Third Nordic Agreements was outstanding as of March 5, 1979. Schedule C, ¶ 25.

29. On or about December 14, 1978, Teltronics executed and delivered to LMU a note payable to LMU in the principal amount of $1 million, due March 31, 1979, to evidence part of Teltronics' current trade debt to LMU. Schedule C, ¶ 26; *see* ¶ 83, *infra.*

## THE LENDING BANKS' RELATIONSHIP WITH LMU AND LME

30. At all times relevant herein, Citibank, N.A., or its predecessor, First Nation-

al City Bank (collectively, "Citibank") provided banking services in the United States and abroad for both LMU and LME. Schedule C, ¶ 13.

31. At all times relevant herein, Nordic American Banking Corporation ("Nordic") was a subsidiary of Svenska Handelsbanken, a Swedish bank that provided banking services for LME. Schedule C, ¶ 14.

32. In 1979, two of LME's eleven directors were also among Svenska Handelsbanken's eighteen directors. Schedule C, ¶ 15.

33. In March 1979, two Svenska Handelsbanken employees' pension trusts together owned shares of LME entitling them to cast approximately 5.4 percent of the votes of all LME stockholders. Schedule C, ¶ 16.

## THE SECURITY AGREEMENT

34. On June 17, 1975, LMU and Teltronics entered into a security agreement "to secure the payment of all indebtedness now existing or hereafter arising payable to [LMU], including, without limitation, indebtedness of [Teltronics] to [LMU] arising out of payments made by [LMU] to [New York banks] pursuant to guarantees by [LMU] of [Teltronics'] loans" (as amended from time to time, the "Security Agreement"). Schedule C, ¶ 29.

35. The Security Agreement was part of a financing arrangement originally proposed by Teltronics that also included bank loans to Teltronics guaranteed by LMU. Tr. 60.12–61.9 (SGM).

36. When the Security Agreement was negotiated and executed, LMU had recently become one of several suppliers of equipment to Teltronics. Tr. 61.20–64.16 (SGM).

37. LMU did not own any stock in Teltronics when the Security Agreement was negotiated and executed, and has never owned any stock in Teltronics. Tr. 64.-17–.19 (SGM).

38. LMU and Teltronics had no officers or directors in common when the Security Agreement was negotiated and executed, and have never had officers or directors in common. Tr. 64.22–.24 (SGM).

39. The Security Agreement was negotiated and entered into at arm's length. Tr. 65.4–.22 (SGM); *see* ¶¶ 34–38, *supra.*

40. Under the Security Agreement, Teltronics granted to LMU a security interest in the following collateral:

(a) certain rental agreements between Teltronics, as lessor, and certain of Teltronics' customers, as lessees, together with all contract rights, accounts, and chattel paper relating thereto;

(b) all equipment rented pursuant to such rental agreements;

(c) all inventory of Teltronics, then owned or thereafter acquired, which was purchased from LMU or manufactured by LME;

(d) all proceeds and products of any of the collateral referred to in subparagraphs (a)–(c) above; and

(e) all returned or repossessed goods arising from or relating to any of the rental agreements referred to in subparagraph (a) above. Schedule C, ¶ 30.

41. From June 1975 through December 1978, Teltronics periodically submitted to LMU a document ("collateral list") that listed rental agreements designated by Teltronics as subject to LMU's security interest and the aggregate "present value" thereof as defined in the Security Agreement ("defined present value"), as calculated by Teltronics. Schedule C, ¶ 31; exh. 431, fol. tab 7.

42. As amended from time to time, section 5(g) of the Security Agreement required that the defined present value of all rental agreements subject to LMU's security interest should equal or exceed a specified amount which was related to the outstanding amount of Teltronics' indebtedness guaranteed by LMU. Exh. 431.

43. On May 1, 1978, in connection with LMU's guarantee of an additional loan by Nordic to Teltronics of $1 million, Teltronics and LMU entered into an amendment to the Security Agreement that increased to $8.1 million the total defined present value of the rental agreements in which Teltron-

ics was required to grant LMU a security interest. Exh. 431, fol. tab 6.

44. On May 1, 1978, LMU, Teltronics, and Nordic executed a letter agreement acknowledging that Teltronics was not then in compliance with the $8.1 million collateral requirement and providing that such noncompliance would not be deemed a default under the Security Agreement prior to February 1, 1979, on the conditions that Teltronics would grant LMU a security interest in rental agreements having a defined present value of at least $6.8 million at all times prior to such date and that Teltronics would promptly forward to LMU and grant LMU a security interest in all rental agreements entered into by Teltronics during the period from May 1, 1978, through February 1, 1979. Tr. 1807.21–1812.20 (RKP); exh. 99.

45. The last collateral list submitted by Teltronics to LMU was dated December 29, 1978. This list included 278 rental agreements having defined present values totalling $6,993,516. Tr. 850.6–.15 (DMC); exh. 431, fol. tab 7, at 59–64.

## LMU'S PERFECTION OF ITS SECURITY INTEREST

46. The trustee concedes that LMU filed financing statements to perfect its security interest in all the collateral subject to the Security Agreement except for 64 rental agreements referred to in a letter by Richard S. Miller, an attorney representing the trustee, a copy of which is annexed to the trustee's answer as exhibit I. Schedule C, ¶ 33.

47. In the letter referred to in paragraph 46 above, Miller: (1) questions whether LMU perfected its security interest in the following nine leases by either filing financing statements or taking possession of the rental agreements: Arthur J. Choice Oil Corp.; East Orange Community Mental Health Center (three rental agreements); Frederick Goldman, Inc.; Grand Street Settlement; Howard Bloom Organization, Inc.; Liberty Electronics, Inc.; and Raleigh Overseas, Inc.; and (2) contends that LMU did not properly perfect its security interest in the leased equipment under 55 leases as to which LMU filed financing statements because LMU did not file such statements in the respective counties where the equipment was installed.

48. Of the nine rental agreements as to which Miller questioned whether LMU had either filed financing statements or taken possession, LMU filed financing statements as to one, to wit: Liberty Electronics, Inc., see exh. 432, and took possession of the remaining eight. Schedule C, ¶ 34; complaint exh. B; tr. 846.17–849.24 (DMC); exh. 239–41.

49. Of the 55 rental agreements contested by Miller on the ground that the financing statements should have been filed in the counties where the equipment was installed, LMU filed financing statements in both the department of state and in those counties in which Teltronics successively maintained its principal office, i.e., New York County and Queens County. Schedule C, ¶ 6; answer exh. I; exh. 432, fol. tabs 1, 2, 3.

## TELTRONICS' FINANCIAL DIFFICULTIES

### A. *The Obsolescence Problem*

50. Pursuant to the Citibank and Nordic loans, Teltronics was required to purchase LME PABX equipment from LMU having an aggregate purchase price related to the amount of the bank loans that LMU guaranteed. Exh. 1, 13, 17, 29, 49.

51. Prior to 1979, the PABXs manufactured by LME and sold by LMU employed electro-mechanical technology. Tr. 2128.2–2128.7 (DES). By late 1978, several other manufacturers marketed electronic PABXs utilizing more advanced analog and digital switching techniques. Tr. 2128.2–2130.25 (DES). The electronic PABXs had the advantages of smaller size, lower price and ease of handling. Tr. 2128.16–2129.7 (DES).

52. As early as 1977, LMU regarded its electro-mechanical PABXs as obsolete. Exh. 45, T–61, T–94, T–115. Throughout 1977 and 1978 it attempted to perfect its own electronic PABXs. Exh. 45, T–61, T–94, T–115, T–148, T–174, T–191, T–217, T–229.

53. The inability of LMU to provide Teltronics with state of the art technology placed Teltronics at a competitive disadvantage in marketing PABX equipment. *See* ¶¶ 50–52, *supra.*

### B. *The Need for Deferrals and Additional Financing*

54. Prior to October 6, 1977, LMU and Teltronics negotiated an agreement pursuant to which LMU would guarantee additional bank loans to Teltronics totalling $2.8 million. Tr. 67.19–68.20 (SGM); exh. 46, 63.

55. In connection with the negotiations referred to in paragraph 54 above, Teltronics submitted to LMU cash flow projections which indicated that the proposed loans of $2.8 million would provide all the external financing required by Teltronics until the end of 1978. Tr. 67.19–68.20 (SGM); exh. 45 at 8, T–59, T–61 at 4, T–67, T–80.

56. Notwithstanding the representations referred to in paragraph 55 above, in or about March 1978 Teltronics informed LMU that it would require immediate additional financing in the amount of $1.5 million. Tr. 70.16–71.25 (SGM); exh. T–59, T–61, T–67.

57. Early in 1978, LMU and LME considered various ways of reducing Teltronics' dependence on LMU-guaranteed financing. Exh. T–48, T–58, T–61. When Teltronics submitted its 1978 annual budget to LMU, calling for an increase in sales from approximately $10 million in 1977 to approximately $19 million in 1978, LMU recommended to Teltronics that it scale down its growth projections and overhead in accordance with LMU's decision to limit its estimated additional guaranteed financing for 1978–80 to $1.5 million. Exh. T–35, T–48, T–52, T–58, T–61, T–67.

58. On March 31, 1978, Teltronics, without LMU's knowledge or consent, failed to pay interest which was then due to Nordic under the Second Nordic Agreement. Tr. 858.3–.5 (DMC); exh. 87.

59. On or about April 12, 1978, Teltronics sought and obtained Nordic's consent to the deferral until April 18, 1978 of the interest payment that had been due on March 31, 1978. Tr. 1291.5–.12 (LTR); exh. 87.

60. On or about April 17, 1978, Teltronics sought and obtained the agreement of LMU and Nordic to the further deferral until April 30, 1978 of the interest that had been due on March 31, 1978. Tr. 856.22–858.5 (DMC), 1291.15–.21 (LTR); exh. 89, 90.

61. Prior to May 1, 1978, Teltronics and LMU negotiated an agreement pursuant to which LMU would guarantee an additional bank loan to Teltronics in the amount of $1 million. Tr. 324.10–.13 (SGM), 327.2–.5 (SGM); exh. 106–07.

62. In connection with the negotiations referred to in paragraph 61 above, Teltronics submitted to LMU cash flow projections indicating that the contemplated loan of $1 million, together with an additional loan of $500,000 that Malmstrom promised to make available in September 1978, would be the last outside financing that Teltronics would require through the end of 1980. Tr. 70.16–71.25 (SGM), 327.2–.5; exh. 82.

63. On May 1, 1978, the $1 million loan referred to in paragraph 61 above was granted to Teltronics by Nordic and guaranteed by LMU. Exh. 105–07.

64. Contrary to the projections referred to in paragraph 62 above, Teltronics soon found itself in need of additional financing. In April 1978, Malmstrom encouraged Teltronics to satisfy its additional cash requirements through sources other than LMU-guaranteed loans. Tr. 325.22–326.7 (SGM); exh. T–71.

65. On or about May 11, 1978, Teltronics obtained a $300,000 line of credit from State National Bank of Connecticut. Tr. 1779.16–1780.9 (RKP); exh. 122.

66. On or about May 24, 1978, Teltronics obtained a $200,000 line of credit from United Counties Trust Company, which was subsequently increased to a $400,000 line of credit. Tr. 1680.2–.17 (RKP), 1681.3–1682.5 (RKP); exh. 148.

67. On or about July 24, 1978, Teltronics obtained a $1 million line of credit from Sterling National Bank & Trust Company

("Sterling") and granted Sterling a security interest in certain inventory and accounts receivable. Tr. 326.5–.20 (SGM), 1679.22–1681.2 (RKP), 1682.6–1684.10 (RKP), 1685.-10–.23 (RKP); exh. 182.

68. On August 31, 1978, Teltronics failed to pay a promissory note, evidencing a loan in the amount of $700,000, which was then due and owing to Nordic, the payment of which had been guaranteed by LMU. Tr. 858.6–859.20 (DMC), 1313.18–1314.23 (LTR), 1768.8–1769.14 (RKP); exh. 42–44.

69. On or about August 31, 1978, Teltronics sought and obtained the agreement of Citibank and LMU to a deferral until October 31, 1978, of a principal payment in the amount of $296,428 which was due from Teltronics on August 31, 1978. Tr. 1769.17–1770.5 (RKP).

70. In September 1978, the additional $500,000 loan that Malmstrom had promised to make available through Nordic, see ¶ 62 *supra,* was not effectuated because Teltronics made no request or application therefor. Tr. 823.11–.16 (SGM).

71. On October 31, 1978, Teltronics failed to pay interest which was then due and owing to Nordic on the loan referred to in paragraph 68 above. Tr. 1300.7–1301.7 (LTR), 1771.8–1772.13 (RKP); exh. T–169. Nordic and LMU subsequently agreed to a deferral of payment to November 30, 1978. Exh. T–167.

72. On or about October 31, 1978, Teltronics sought and obtained the agreement of Citibank and LMU to the deferral until November 30, 1978, of a principal payment in the amount of $296,428 which was due from Teltronics to Citibank on October 31, 1978. Exh. 205.

73. As part of the equity negotiations held on November 29, 1978, see ¶ 123 *infra,* Malmstrom stated that LMU would arrange for further deferrals of Teltronics' scheduled debt service to Nordic and Citibank, and of debt payments to LMU, until the equity transaction was consummated. The target date for consummation of the equity transaction was March 31, 1979. Tr. 1874.-4–1876.23 (DMK), 1976.24–1984.19 (RMC), 2560.17–2561.9 (COL).

74. On or about November 29, 1978, Nordic and LMU agreed to the deferral until February 28, 1979, of interest due from Teltronics to Nordic on November 30, 1978. Tr. 867.3–.20 (DMC), 1298.5–1301.21 (LTR), 1772.10–.13 (RKP); exh. T–167, T–169.

75. On or about November 30, 1978, Teltronics sought and obtained the agreement of Citibank and LMU to the deferral until January 31, 1979, of the principal payment due from Teltronics to Citibank that had previously been deferred from October 31, 1978, to November 30, 1978. Tr. 868.3–870.-13 (DMC); exh. 250, T–170.

76. On December 15, 1978, Teltronics' note due August 31, 1978, was replaced with a note payable on demand. Tr. 859.-4–.20 (DMC), 1313.18–1314.23 (LTR), 1991.-14–1992.9 (RMC); exh. 265, T–192.

77. On January 26, 1979, Teltronics sought and obtained the agreement of Citibank and LMU to the deferral to March 31, 1979, of: (a) the principal payment in the amount of $296,428 due from Teltronics to Citibank on January 31, 1979, and (b) the principal payment in the same amount originally due from Teltronics to Citibank on October 31, 1978, that had previously been deferred to January 31, 1979. Tr. 891.17–893.3 (DMC), 1778.14–1779.6 (RKP); exh. 282, 285.

C. *Teltronics' Trade Account With LMU*

78. From 1974 until December 1978, LMU sold equipment to Teltronics on open account with a one percent discount for payment within 10 days and with full payment due within 30 days. Tr. 870.13–.16 (DMC).

79. The terms referred to in paragraph 78 above were the usual terms on which LMU sold equipment to all its distributors. Tr. 870.13–.19 (DMC).

80. On November 30, 1978, the amount due from Teltronics to LMU on open account was $1,108,118.17, of which $866,-453.73 was overdue, $616,421.09 was more than 90 days overdue, and $89,672.51 was

more than 180 days overdue. Tr. 870.20–872.23 (DMC); exh. 254.

81. Teltronics did not make any payment on its trade account with LMU between August 25 and December 14, 1978, despite several requests therefor by LMU. Tr. 872.24–873.17 (DMC); exh. 271.

82. In December 1978, LMU placed Teltronics on C.O.D. terms because of concern regarding the magnitude of Teltronics' outstanding trade debt to LMU. Tr. 878.9–.17 (DMC); see ¶¶ 80–81, supra.

83. On December 14, 1978, Teltronics executed a note payable to LMU in the principal amount of $1 million, due March 31, 1979, to evidence $1 million of Teltronics' trade debt to LMU. Schedule C, ¶ 26; tr. 104.12–105.7 (SGM), 878.18–879.10 (DMC), 1075.25–1076.19 (DMC); exh. 264, T–188.

84. By letter dated December 20, 1978, Malmstrom informed Beagan that: (1) steps had to be taken to rectify the discrepancy between the monthly payments indicated on the collateral lists and the amounts delivered to the "lock box" account, see ¶¶ 91–98 infra; (2) the rental agreements subject to LMU's security interest had fallen substantially below the collateral requirements of the Security Agreement; (3) the collateral lists submitted by Teltronics were misleading because they included rental agreements on which no payments were being received; and (4) Teltronics' trade debt to LMU should be secured and some payment should be made thereon. Tr. 105.8–109.6 (SGM), 533.23–534.7 (SGM), 879.11–880.2 (DMC); exh. 267, T–190.

85. On or about December 26, 1978, Teltronics paid LMU $150,000 in partial satisfaction of its trade account. Tr. 880.3–.7 (DMC), 1083.17–.21 (DMC); exh. 271.

86. Following the payment referred to in paragraph 85 above, LMU resumed selling equipment to Teltronics on open account. Tr. 563.22–564.19 (SGM), 880.-3–.12 (DMC).

87. Between December 27, 1978, and January 5, 1979, Teltronics incurred additional trade debt to LMU in the amount of $67,871.08. Tr. 880.13–881.16 (DMC), 1237.-7–.21 (PL); exh. 271, 409.

88. Between December 20, 1978, and January 8, 1979, Beagan did not answer Malmstrom's letter referred to in paragraph 84 hereinabove, exh. 267, and Malmstrom was unsuccessful in his attempts to reach Beagan by telephone. Tr. 110.7–.20 (SGM).

89. By letter dated January 8, 1979, Costello advised Chanda that in light of Teltronics' failure to resolve the problems identified in Malmstrom's letter of December 20, 1979, exh. 267, LMU again would sell equipment to Teltronics only on C.O.D. terms. Tr. 110.13–112.2 (SGM), 881.19–882.22 (DMC), 1090.7–.24 (DMC); exh. 278.

90. In early February 1979, Costello telephoned Chanda and told him that LMU would continue to sell equipment to Teltronics only on C.O.D. terms. Tr. 1104.25–1106.4 (DMC), 1110.14–1111.3 (DMC), 1113.-23–1114.16 (DMC), 1116.2–.11 (DMC), 1121.-10–.25 (DMC), 2011.8–2012.7 (RMC), 2016.6–2017.2 (RMC).

THE LOCK BOX AGREEMENT

91. In or about March 1978, LMU, Teltronics, and Manufacturers Hanover Trust Company ("Manufacturers") entered into an agreement whereby:

(a) Teltronics would instruct all lessees under rental agreements in which Teltronics had granted a security interest to LMU to send their monthly rental payments to a certain post office box at the Church Street Station of the United States Post Office (the "lock box").

(b) Manufacturers would collect all checks delivered to the lock box and, with certain exceptions, deposit the checks in a checking account maintained by Teltronics at Manufacturers (the "lock box account").

(c) Manufacturers would issue monthly statements to Teltronics showing each check deposited in the lock box account.

(d) Teltronics would furnish LMU with copies of the statements referred to in subparagraph (c) above.

(e) Upon notice by LMU to Manufacturers that Teltronics had defaulted under the Security Agreement, the current balance of

the lock box account would become the property of LMU.

(f) Unless and until LMU gave Manufacturers the notice referred to in subparagraph (e) above, Teltronics would be free to withdraw any funds in the lock box account. Tr. 859.21–863.10 (DMC), 1667.5–1668.13 (RKP); exh. 50, 80, T–55.

92. The collateral list dated June 1, 1978, listed rental agreements with monthly rental payments totalling $142,315. Teltronics did not submit any other collateral list to LMU prior to August 31, 1978. Tr. 1233.8–.24 (PL); exh. 431, fol. tab 7, at 35–40.

93. On or about October 24, 1978, Teltronics sent LMU a statement for the lock box account that showed that the payments delivered to the lock box during August 1978 totalled only $68,587.10. Tr. 863.11–864.6 (DMC), 1181.5–1183.10 (DMC); exh. 197.

94. The collateral list dated August 31, 1978, indicated that Teltronics had granted to LMU a security interest in rental agreements with monthly payments totalling $143,247. Teltronics did not submit any other collateral list to LMU until October 20, 1978. Tr. 1235.7–.14 (PL); exh. 431, fol. tab 7, at 41–46.

95. Sometime in November 1978, Teltronics submitted to LMU a statement for the lock box account showing that the payments delivered to the lock box during September 1978 totalled only $44,027.99. Tr. 864.7–865.5 (DMC), 1183.11–.25 (DMC); exh. 194.

96. The collateral list dated October 20, 1978, indicated that Teltronics had granted to LMU a security interest in rental agreements with monthly payments totalling $156,011. Exh. 431, fol. tab 7, at 47–52.

97. On or about November 21, 1978, Teltronics submitted to LMU a statement for the lock box account showing that the payments delivered to the lock box during October 1978 totalled only $59,240.60. Tr. 865.22–867.2 (DMC); exh. 208.

98. Subsequent to November 21, 1978, LMU had reasonable grounds to conclude that either Teltronics was not complying with the lock box agreement or that the total rents actually paid pursuant to the rental agreements subject to LMU's security interest were substantially less than Teltronics represented on the monthly collateral lists. *See* ¶¶ 92–97, *supra.*

THE EQUITY PROPOSALS

A. *The Tsai Overture*

99. On May 31, 1978, Gerald Tsai, on behalf of Associated Madison Companies, Inc., requested a meeting with Beagan to discuss the possibility of his purchasing equity in Teltronics. Exh. 150.

100. After meeting with Beagan, Tsai made a written offer to acquire a minimum of 20% of Teltronics' stock at $8 per share and to assist in arranging such long-term financing as might be needed for Teltronics' growth. Exh. 150.

101. In the second week of June 1978, Beagan and Kleban informed LMU that Tsai had indicated that he intended to acquire shares of Teltronics, and Beagan suggested to Malmstrom that LMU should acquire a number of shares of Teltronics equal to the number of shares owned by Beagan. Tr. 76.24–78.7 (SGM), 80.2–82.20 (SGM); exh. 150.

102. After his conversation with Beagan, Malmstrom discussed with LME whether LMU should purchase shares of Teltronics; LME directed LMU not to purchase shares of Teltronics. Tr. 78.8–79.19 (SGM).

103. In or about mid-June 1978, Malmstrom told Beagan that LMU was not authorized to purchase shares of Teltronics. Tr. 79.20–.25 (SGM); exh. T–115 at 2.

104. Thereafter, Beagan declined Tsai's private placement offer; but both he and Malmstrom considered the possibility that Tsai might then make a public tender for Teltronics' stock. Exh. T–94. Malmstrom asked LME for permission to set up a standby plan for LMU to buy enough of Teltronics' stock to frustrate any threatened outside takeover. *Id.*

105. On July 14, 1978, Edmark asked Malmstrom to prepare an analysis of vari-

ous possibilities, including an LMU equity investment, for preserving the LMU/Teltronics relationship. Tr. 343.5–345.13 (SGM); exh. 180.

106. On July 28, 1978, Beagan informed Tsai that he would oppose any tender offer by making prompt arrangements with LMU for an equity position. Tr. 347.22–349.14 (SGM); exh. T–110.

107. In July and August, 1978, Tsai succeeded in buying close to 8% of the shares of Teltronics on the over-the-counter market. Exh. T–115.

B. *The Loral Overture*

108. On September 26, 1978, representatives of Loral Corporation, a large manufacturer of electronic products, met with Beagan to seek the approval of Teltronics' management for a 100% cash tender for the purchase of all of Teltronics' stock. Exh. T–132.

109. In late September or early October 1978, Beagan told LMU that Loral Corporation had indicated an intention to acquire control of Teltronics, and asked LMU to purchase shares of Teltronics in order to prevent the threatened takeover by Loral. Tr. 86.4–87.9 (SGM), 387.6–.18 (SGM); exh. T–129.

110. Beagan scheduled a second meeting with Loral for October 5, 1978. Exh. T–132. Malmstrom immediately contacted Sullivan & Cromwell for assistance in opposing the threatened takeover. Tr. 388.-12–90.7 (SGM); exh. T–129, T–303 at 1–2. On October 2, Halvorsen met with Howe and Lawson of Sullivan & Cromwell and with Beagan and Chanda of Teltronics to discuss means by which Teltronics might resist Loral. Exh. T–129, T–303 at ¶ 3.

111. Thereafter, Malmstrom arranged with Nordic to make available up to $4 million for possible additional LMU-guaranteed loans to Teltronics. Exh. T–129, T–131.

112. On October 4, 1978, Malmstrom suggested to Lilliecreutz that a Loral takeover of Teltronics would be harmful to LMU, and pressed Lilliecreutz to approve an LMU purchase of equity in Teltronics. Malmstrom also asked for LME's confirmation that if LMU equity financing were not made available, LMU could nevertheless offer Teltronics $4 million of open account trade credit over the next twelve months. Exh. T–132.

113. On October 5, 1978, there was an all-day meeting between Loral and Teltronics representatives. Exh. T–133. On that day, Lilliecreutz gave Malmstrom the authorization that he had requested, stating in a telex:

WE CONFIRM THAT WE ARE PREPARED TO RENDER CONTINUING SUPPORT TO TELTRONICS' S (sic) IN THE MAGNITUDE OF US $ 4 M IN CONNECTION WITH PURCHASES OF EQUIPMENT FROM US SHOULD EQUITY FINANCING NOT BE POSSIBLE.

Exh. T–134. There is no evidence that this authorization was at that time communicated to Teltronics. *See* tr. 2646.5–2650.13 (CHS).

114. On October 7–9, 1978, representatives of LME, LMU, and Teltronics conducted negotiations in New York concerning a possible purchase by LMU of shares of Teltronics, subject to LME's approval. Tr. 87.10–89.16 (SGM).

115. On October 9, 1978, LME declined to approve the proposed purchase of shares of Teltronics. Tr. 89.8–.13 (SGM).

116. On October 9, 1978, LMU told Teltronics that LME had declined to approve the proposed purchase of shares of Teltronics. Tr. 89.14–.16 (SGM), 2554.7–.21 (COL).

117. Prior to October 16, 1978, Teltronics' management rejected the Loral tender offer, and Loral decided not to go forward with it over management's objections. Exh. T–140.

C. *The Northeast Concept*

118. A principal reason for LME's reluctance to approve LMU's purchase of Teltronics' stock during the Tsai and Loral overtures was the high market price of over $8 per share that was then commanded by the stock. Exh. T–107, T–110, T–112.

119. On October 31, 1978, LME's chairman, Bjorn Lundvall, visited Malmstrom in New York to discuss LMU's future marketing plans. Tr. 408.14–409.25 (SGM); Exh. T–148. During their meeting, Lundvall asked Malmstrom to submit a plan for the purchase of one-third of Teltronics' shares, partially for cash and partially in exchange for turning over to Teltronics the stock or assets of LMU's direct sales offices in Boston ("LMB") and Philadelphia ("LMP"). Tr. 416.7–417.10. In 1974, LMU acquired LMB, a formerly independent distributor that had fallen behind on its trade debt to LMU, for a cash payment of under $100,000 and an assumption of its liabilities. Tr. 214.15–217.25 (SGM). In or about 1976, LMU established a Philadelphia office, LMP, to replace an independent distributor that had fallen behind on its trade debt to LMU. Tr. 237.10–241.7 (SGM).

120. Prior to making a proposal to Teltronics, LMU determined that it would assign inflated values to LMB and LMP so that the total consideration given to Teltronics would be less than the stated value of $6 per share. Exh. T–153, T–154, T–155. In addition, Strom proposed that LMU would "write off the principally fictitious claim on TSI [Teltronics] for support" in order to make up the difference between the market price and the stated consideration. Tr. 418.3–423.12 (SGM); exh. T–154.

121. Malmstrom referred to the new plan as the "Northeast Concept." Tr. 413.-24–417.10 (SGM).

122. In November 1978, LMU and Teltronics entered into negotiations concerning a possible purchase by LMU of shares of Teltronics in accordance with the Northeast Concept. Schedule C, ¶ 12; tr. 91.19–96.18 (SGM).

123. At a meeting on November 29, 1978, LMU and Teltronics prepared the following tentative time schedule of steps leading to a possible acquisition by LMU of shares of Teltronics, tr. 93.3–94.12 (SGM), 95.17–96.18 (SGM), 1870.9–1871.2 (DMK); exh. T–166:

| December 15, 1978 | Agreement in principle and press release |
| December 31, 1978 | Hart-Scott-Rodino filing |
| January 10, 1979 | Definitive agreement signed |
| January 15, 1979 | Filing of preliminary proxy material with SEC |
| February 10, 1979 | Audit completed |
| February 15, 1979 | Mailing proxy statement to stockholders |
| March 15, 1979 | Stockholders Meeting |
| March 20, 1979 | Closing |
| March 31, 1979 | Filing of schedule 13D by LMU |

124. On the basis of the discussions at the November 29 meeting, counsel for LMU sent Kleban a letter dated December 5, 1978, enclosing a proposed draft letter of intent outlining the terms of a possible purchase by LMU of shares of Teltronics subject, *inter alia,* to a review of Teltronics' financial statements by auditors acceptable to LMU, and asked for Teltronics' reply within two days. Tr. 97.9–99.15 (SGM), 1878.2–.13 (DMK), 1985.11–.17 (RMC); exh. 260.

125. Beagan did not respond to the letter referred to in paragraph 124 above between December 5 and December 13, 1978. Tr. 99.22–100.8 (SGM), 518.3–.6 (SGM), 526.-15–.19 (SGM), 1986.7–1987.4 (RMC); exh. 263.

126. By letter dated December 13, 1978, Beagan advised Malmstrom that due to the time demands incident to the year-end rush, he was unable to concentrate on the draft letter of intent and that he was postponing further discussions concerning a possible purchase by LMU of shares of Teltronics until after the end of the year. Tr. 99.22–102.5 (SGM), 1882.20–1883.19 (DMK); exh. 263.

127. By letter dated December 20, 1978, Malmstrom told Beagan that he was willing to postpone the discussions concerning the possible purchase by LMU of shares of Teltronics but that Teltronics' financial situation and marketing capabilities would have to be reassessed when the discussions were resumed. Tr. 102.7–103.13 (SGM), 1883.20–1884.13 (DMK); exh. 266.

128. At a meeting on January 25, 1979, Malmstrom told Beagan that LMU would not purchase any shares of Teltronics until, *inter alia*, LMU's auditors had conducted a review of Teltronics' books and records and a securities analyst had conducted a study of the fair value of Teltronics' shares. Tr. 124.7–.24 (SGM); exh. T–210.

129. None of the steps toward the contemplated acquisition that were included in the schedule prepared at the November 29, 1978 meeting were ever effectuated. Tr. 96.20–97.8 (SGM), 2088.3–2090.14 (DMK).

130. Neither the review by LMU's auditors nor the study by a securities analyst stipulated by Malmstrom on January 25, 1979, was ever commenced. Tr. 124.25–125.13 (SGM), 1529.18–1530.20 (GMR), 1543.8–.24 (GMR), 1579.9–.14 (GMR).

THE PRE–DEFAULT SCENARIO

131. On January 16, 1979, Malmstrom met with Beagan for the purpose of discussing the relationship between LMU and Teltronics. Since Beagan failed to bring with him a budget and business plan for Teltronics that had been requested by Malmstrom, little substantive dialogue transpired. Tr. 112.4–113.22 (SGM); exh. T–203.

132. By letter dated January 18, 1979, Malmstrom reiterated to Beagan that it was essential that Beagan bring a budget and business plan for Teltronics to a meeting between Beagan and Malmstrom initially scheduled for January 26, 1979 (but held on January 25, 1979). Tr. 116.8–117.8 (SGM); exh. 280.

133. Prior to January 24, 1979, Costello asked Chanda to meet with him on that date and to bring with him the financial information requested in Malmstrom's letter of January 18, 1979. Tr. 886.8–887.12 (DMC).

134. Chanda did not bring any of the information requested in the letter referred to in paragraph 132 above to the meeting with Costello on January 24, 1979. Tr. 887.-16–888.2 (DMC).

135. Beagan did not bring any of the financial information requested in the letter referred to in paragraph 132 above to the meeting with Malmstrom on January 25, 1979. Tr. 117.9–.13 (SGM), 1009.12–1010.3 (DMC), 1010.22–1011.2 (DMC).

136. On or about January 31, 1979, Teltronics sent LMU an incomplete set of budgets and cash flow information that, *inter alia:*

(a) Indicated that Teltronics had $1.497 million in cash on January 1, 1979;

(b) Projected equipment sales of $18.9 million, which according to Malmstrom's calculations, Tr. 127.24–128.19, would have required purchases of equipment from LMU in excess of $5 million. However, payments to LMU were projected at $2.23 million, thereby resulting in a $3 million increase in Teltronics' trade debt to LMU during 1979;

(c) Projected an increase in long-term indebtedness or stockholders' equity in the amount of $2 million during the second quarter of 1979; and

(d) Assumed a three-year moratorium on principal payments on both the Nordic and the Citibank loans. Tr. 125.14–128.19 (SGM); exh. 286.

137. In late January or early February 1979, Malmstrom, having become increasingly concerned that Teltronics would not meet its interest obligation to Nordic on February 28, 1979, *see* ¶ 160 *infra;* exh. T–203, instructed Halvorsen to prepare a special report on Teltronics for the LMU directors meeting on February 22, including "various ideas about collateral takeover and the bankruptcy considerations." Tr. 2235.-3–.9 (REH).

138. Halvorsen prepared a detailed report dated February 12, 1979, for LMU's directors. Exh. T–227. The report, entitled "Notes on Collateral Takeover," is part of a larger report prepared for the LMU directors that included separate memoranda entitled "Current TSI Status," exh. T–224, "Notes on the TSI Budgets dated 1/30/79," exh. T–225, and "Notes on Chapter 11, Chapter 10, and Straight Bankruptcy," exh. T–226. In the report, Halvorsen outlined the possible courses of action LMU could pursue in the event Teltronics was to default on its bank loans, including taking

possession of the leases subject to LMU's security interest, forcing Teltronics into bankruptcy, and making "arrangements to service the collateral base and other TSI [Teltronics] accounts and establish direct-selling activities in TSI's marketing area." Exh. T–227.

139. In separate telephone calls on February 9, 1979, Chanda told Malmstrom and Strom that Beagan had turned over the management of Teltronics to Chanda and Kleban. Tr. 130.7–.15 (SGM), 2608.4–2609.2 (CHS).

140. On or about February 9, 1979, Costello and Malmstrom separately spoke by telephone with Chanda and told him that Teltronics should not assume a three-year moratorium on principal payments as indicated in the budgets and cash flow statements referred to in paragraph 136 above. Tr. 128.23–132.18 (SGM), 1110.14–1111.3 (DMC).

141. On February 10, 1979, contrary to LMU's requests, two representatives of Teltronics, Cheng and Smith, went to Sweden in an effort to meet with representatives of LME. On February 12, 1979, Cheng and Smith telephoned Strom and stated that they wished to meet with LME personnel for the purpose of discussing LME's telecommunications products and certain marketing proposals. Tr. 2134.18–2141.23 (DES); exh. 379.

142. Strom arranged for Smith and Cheng to have an impromptu meeting with personnel of LME's engineering staff. Tr. 2140.9–2141.23 (DES).

143. On or about February 14, 1979, Bjorn Svedberg, President of LME, had a brief courtesy meeting with Smith and Cheng. Tr. 2697.15–2701.13 (CHS), 2716.-20–2717.9 (CHS). On February 16, 1979, Strom admonished Chanda that the meeting on February 14, 1979 was only a matter of courtesy and did not entail substantive discussions. Tr. 2616.11–2618.8 (CHS).

144. In response to Chanda's desire to speak with LME management, Strom came to New York on February 13, 1979 for discussions with Chanda. Tr. 2533.22–

2534.10 (COL), 2607.12–2609.20 (CHS). A dinner meeting on February 15, 1979 was attended by Strom, Chanda, Kleban, Beagan, and Halvorsen. The Teltronics representatives told Strom that they found it difficult to work with Malmstrom and they read a proposed press release accusing LMU of conspiring to drive down the price of Teltronics' stock in furtherance of an effort to acquire control of Teltronics. Strom denied the charges in the press release. Tr. 1888.3–1893.11 (DMK), 1905a.24–1906.13 (DMK), 1910.25–1915.18 (DMK), 2026.24–2028.14 (RMC), 2609.21–2614.13 (CHS), 2633.20–2636.21 (CHS), 2668.18–.25 (CHS); exh. T–230.

145. On February 22, 1979, Chanda and Kleban met with LMU's directors during an intermission in a meeting of LMU's board of directors. Tr. 143.4–.18 (SGM), 144.7–.11 (SGM), 1917.2–1918.17 (DMK), 2038.16–2039.21 (RMC), 2534.11–.23 (COL), 2619.-14–.21 (CHS); exh. 296 at 13–14.

146. At the February 22 meeting, Chanda and Kleban told LMU's directors that Beagan had turned over the management of Teltronics to them and they urged that LMU make an immediate commitment to purchase 14.9 percent of Teltronics' outstanding shares and agree to a three-year moratorium on Teltronics' indebtedness. Tr. 144.12–145.16 (SGM), 1918.18–1921.15 (DMK), 2091.13–2093.4 (DMK), 2039.22–2040.15 (RMC), 2535.4–.13 (COL), 2620.8–2622.2 (CHS); exh. 296 at 13–14.

147. At the February 22 meeting, Chanda and Kleban told LMU's directors that unless LMU complied promptly with Teltronics' request for further financial assistance, it would be impossible for Teltronics to continue in business. Tr. 144.12–145.16 (SGM), 1924.18–1925.21 (DMK), 2093.5–2095.9 (DMK), 2536.3–.10 (COL), 2620.8–2622.2 (CHS); exh. 296 at 13–14.

148. At the February 22 meeting, Malmstrom and Stein told Chanda and Kleban that LMU would not purchase any shares of Teltronics, that it would not agree to a three-year moratorium on Teltronics' indebtedness, and that Teltronics would not receive any further financial assistance

from LMU. Tr. 146.14–147.3 (SGM), 1921.-3–.5 (DMK), 1922.12–1923.11 (DMK), 2040.-16–2041.17 (RMC), 2535.14–2536.2 (COL), 2536.14–.23 (COL), 2621.22–2622.2 (CHS), 2623.14–2624.7 (CHS); exh. 296 at 13–14.

149. At a meeting on February 23, 1979, held at Beagan's request, Stein and Strom told Beagan that LMU had no interest in purchasing shares of Teltronics and would not agree to a moratorium on Teltronics' indebtedness. Tr. 2624.22–2625.10 (CHS), 2627.7–2628.14 (CHS).

150. On February 27, 1979, Chanda delivered to Lennmalm a revised budget showing that Teltronics had no cash whatsoever at the beginning of 1979, tr. 151.6–153.3 (SGM), 1799.11–1801.16 (RKP), 2047.-20–2051.17 (RMC), 2537.7–2540.20 (COL); exh. 297, whereas the financial statements submitted by Teltronics to LMU on January 31, 1979, had showed a cash balance of $1.49 million at the beginning of 1979, exh. 286; see ¶ 136, supra. Although this discrepancy may have been caused by Teltronics' statement in the budget of its cash position as of the end of February, 1979, rather than as of the beginning of the year as therein indicated, LMU was apparently never so informed. Tr. 2050.3–2051.6 (RMC); exh. T–342, at 4.

151. As of February 28, 1979, LMU had guaranteed Teltronics' outstanding indebtedness to Nordic in principal amount of $4.5 million, and to Citibank in principal amount of $3,063,574. Schedule C, ¶¶ 19–21, 23–25; tr. 163.6–.17 (SGM).

152. On the morning of March 5, 1979, Costello telephoned several of the lessees under rental agreements in which Teltronics had granted a security interest to LMU and learned that Teltronics had sold the rental agreements to third parties without LMU's knowledge or consent. Tr. 920.20–924.20 (DMC), 927.15–929.4 (DMC), 2287.-15–.17 (REH); see ¶¶ 184–203, infra.

TELTRONICS' DEFAULTS UNDER THE NORDIC LOAN AGREEMENTS

A. *Teltronics' Failure to Make the Nordic Interest Payment*

153. On February 28, 1979, interest exceeding $220,000 was owing by Teltronics to Nordic. Schedule C, ¶ 35. Pursuant to the Nordic Loan Agreement, Teltronics was allowed a grace period of two business days to pay overdue interest. Exh. 46, at § 7(b) of General Conditions.

154. At no time did Teltronics ever pay the interest due Nordic on February 28, 1979. Tr. 1369.24–1370.7 (LTR), 1375.12–1377.23 (LTR), 1416.22–1417.9 (LTR), 1428.-21–1429.10 (LTR), 2102.23–2106.9 (DMK); answer ¶ 18.

155. On or about December 28, 1978, Lars Radberg, the president of Nordic, had told Malmstrom that Nordic's bank examiners were critical of Nordic's loans to Teltronics because of the deferral of interest payments, and asked that LMU provide a letter authorizing Nordic to charge LMU's account for the interest due from Teltronics on February 28, 1979, in the event that Teltronics did not pay it. Radberg repeated this request to Costello on January 2 and January 12, 1979. Tr. 884.22–885.9 (DMC), 952.16–954.16 (DMC), 1088.22–1089.6 (DMC), 1314.24–1318.17 (LTR), 1320.8–1321.25 (LTR), 1322.22–1324.17 (LTR); exh. T–273 at 3, 5, 6.

156. On or about January 26, 1979, in response to Nordic's repeated requests referred to in paragraph 155 above, LMU sent a letter to Nordic advising Nordic that it could charge LMU's account for the February 28, 1979 interest payment if for some reason Teltronics was unable to make the payment. Tr. 132.19–134.11 (SGM), 646.22–647.15 (SGM), 652.3–655.14 (SGM), 884.22–886.4 (DMC), 952.6–956.20 (DMC), 958.15–959.2 (DMC), 1088.22–1089.6 (DMC), 1331.8–1332.16 (LTR); exh. 283, T–209.

157. At no time prior to March 6, 1979 was Teltronics ever informed of LMU's authorization to Nordic to charge its account in the event the interest payment was not made by Teltronics on February 28, 1979. Tr. 136.13–.18 (SGM), 652.24–654.12 (SGM), ·886.5–.7 (DMC), 957.12–958.7 (DMC), 1135.-2–.11 (DMC).

158. On February 28, 1979, L. Stanton Towne of Sullivan & Cromwell instructed Radberg that notwithstanding the prior let-

ter of authorization, Nordic should not charge LMU's account in the event the interest payment was not made by Teltronics on February 28, 1979. Tr. 1354.14–1358.4 (LTR), 1432.14–1440.17 (LTR), 1587.23–1588.7 (LST). Towne explained that as far as LMU was concerned, it was "the end of the line" for Teltronics, and if Nordic charged LMU's account for the interest, Teltronics would not technically be in default. In order to protect its security interest, LMU wanted Nordic to declare a formal default. Tr. 1343.10–1359.4 (LTR), cf. 1583.13–1588.7 (LST), 1594.10–1598.16 (LST); exh. T–273.

159. Nordic never charged LMU's account for the interest due from Teltronics on February 28, 1979. Tr. 1355.10–1358.4 (LTR), 1433.21–1434.18 (LTR); exh. 391, T–245.

B. *LMU Never Represented to Teltronics That It Was Not Required to Make the Nordic Interest Payment*

160. On January 18, 1979, at LMU's request, Nordic sent Teltronics a letter in which Nordic reminded Teltronics that certain interest on its indebtedness to Nordic was due on February 28, 1979, and asked Teltronics to sign and return a copy of the letter to indicate its acknowledgment of the due date for the interest. Tr. 574.14–576.6 (SGM), 583.20–.23 (SGM), 929.6–.25 (DMC), 1324.18–1329.17 (LTR), 1887.7–.15 (DMK), 1995.18–1996.5 (RMC); exh. 280, T–202, T–273 at 7.

161. Teltronics received and was aware of the contents of the letter referred to in paragraph 160 above. Tr. 929.6–931.4 (DMC), 1700.10–1702.14 (RKP), 1887.7–.15 (DMK), 2091.3–.10 (DMK), 1995.18–1996.5 (RMC), 2004.5–2005.10 (RMC).

162. Between January 18 and February 28, 1979, Nordic telephoned Teltronics several times and asked it to sign and return the copy of the letter referred to in paragraph 160 above. Tr. 1348.21–1349.8 (LTR), 1415.6–.25 (LTR), 1702.8–.14 (RKP).

163. The management of Teltronics knew that Teltronics was obliged to pay the interest to Nordic on February 28, 1979, and that the interest payment had not been deferred. Tr. 2063.7–.16 (RMC), 2095.25–2097.5 (DMK); see ¶¶ 160–162, supra.

164. At about 7:30 in the morning (New York time) of March 5, 1979, Stenberg, a vice president of LME, telephoned Beagan and asked whether Teltronics would pay the interest that had been due to Nordic on February 28, 1979. Tr. 1934.23–1935.24 (DMK). Later in the morning Stenberg reiterated this inquiry in a telephone conversation with Kleban and informed Kleban that if the interest was not paid, "things would happen more or less automatically." Tr. 1932.6–1935.14 (DMK).

165. In a telephone conversation late in the morning of March 5, 1979, Kleban told Lennmalm that Teltronics could not pay the interest that was due to Nordic on February 28, 1979. Tr. 2543.9–2544.4 (COL), 2590.7–2592.7 (COL).

166. LMU never represented to Teltronics that Teltronics would not be required to make a timely payment of the interest due to Nordic on February 28, 1979. Tr. 180.-20–181.10 (SGM), 867.5–868.2 (DMC), 931.-5–.15 (DMC), 1327.2–.17 (LTR), 1348.21–1349.8 (LTR), 1929.2–1930.13 (DMK), 2075.-24–2077.4 (DMK), 2095.25–2097.25 (DMK), 2100.17–2101.24 (DMK), 2106.13–2107.7 (DMK), 2063.7–.17 (RMC), 2544.5–.11 (COL), 2596.9–.16 (COL). See also, tr. 123.3–.22 (SGM), 150.17–151.5 (SGM), 614.24–615.5 (SGM), 617.12–618.15 (SGM), 621.5–624.15 (SGM), 642.24–644.18 (SGM), 646.9–.21 (SGM), 651.12–.19 (SGM), 653.25–655.8 (SGM), 666.25–667.19 (SGM), 755.25–756.6 (SGM), 771.17–.23 (SGM), 785.3–787.10 (SGM), 836.8–.23 (SGM), 893.9–.11 (DMC), 959.21–960.15 (DMC), 989.14–990.20 (DMC), 998.11–999.7 (DMC), 1000.11–.22 (DMC), 1112.17–1113.22 (DMC), 1116.16–1122.15 (DMC), 1123.23–1124.14 (DMC), 1469.2–1473.22 (FSR), 1487.22–1489.9 (FSR), 1490.-2–.15 (FSR), 1491.17–.25 (FSR), 1500.1–1520.16 (LGH), 1555.6–1556.4 (GMR), 1562.-4–.8 (GMR), 1564.23–1565.11 (GMR), 1579.-15–1581.7 (GMR), 1728.8–.11 (RKP), 1729.-9–.12 (RKP), 1730.25–1731.7 (RKP), 1979.6–1980.21 (RMC), 2004.17–2005.16 (RMC),

2044.4–2045.14 (RMC), 2083.13–2088.19 (DMK), 2095.10–.24 (DMK), 2100.17–2101.24 (DMK), 2102.23–2105.13 (DMK), 2594.13–2596.8 (COL).

167. On prior occasions where Teltronics had obtained deferrals of interest and/or principal payments owing to Citibank or Nordic, it generally received written confirmation of the deferrals prior to the date on which such payments were to become due. Tr. 2090.19–2091.2 (DMK), 2106.10–2107.7 (DMK); *cf.* ¶¶ 58–59, *supra.*

168. At no time did Teltronics obtain a written deferral of the interest payment owing by Teltronics to Nordic on February 28, 1979. Tr. 2100.17–2101.2 (DMK), 2106.-10–2107.7 (DMK).

C. *Teltronics Did Not Rely To Its Detriment On Any Alleged Misrepresentation By LMU*

169. The daily opening balance of Teltronics' principal checking account at Sterling National Bank rose from $214,554.33 on February 28, 1979, to $345,555.98 on March 5, 1979. Exh. 300, T–298.

170. At all times between February 28, 1979, and March 5, 1979, Teltronics had the money with which to pay the interest due to Nordic. Exh. 299, 301–05, 307, 309; answer ¶ 66; *see* ¶ 169, *supra.*

171. Teltronics did not rely to its detriment on any alleged representation that it was not required to pay the interest due to Nordic on February 28, 1979. Tr. 2063.-7–.17 (RMC), 2095.25–2097.25 (DMK), 2106.-13–2107.7 (DMK); *see* ¶¶ 166, 169–170, *supra.*

D. *Nordic's Declaration of Default*

172. By letter delivered by hand early in the afternoon of March 5, 1979, Nordic declared Teltronics to be in default under each of the Nordic loan agreements, demanded full and immediate payment of the $700,000 promissory note of Teltronics under the First Nordic Agreement, which was payable on demand, and also accelerated all the indebtedness of Teltronics due to Nordic under the Second and Third Nordic Agree-

ments, in accordance with the terms of those agreements. The total payment demanded by Nordic from Teltronics was $4,945,360.30, including principal and interest. Tr. 1384.12–1385.2 (LTR), 1386.2–1392.14 (LTR), 1428.18–1429.15 (LTR); exh. 318–22.

173. Teltronics did not make any payments referred to in paragraph 172 above. Schedule C, ¶ 25.

TELTRONICS' DEFAULTS UNDER THE SECURITY AGREEMENT

A. *Teltronic's Failure to Pay the Nordic Loans*

174. Nordic's declaration of default under its various loan agreements constituted an event of default under paragraph 6 of the Security Agreement. Exh. 431.

B. *Teltronics' Failure to Maintain the Collateral Base*

175. Beginning on February 1, 1979, and continuing thereafter until a default was declared on March 5, 1979, Teltronics failed to comply with sections 5(g) and 6(g) of the Security Agreement, as amended, which required Teltronics to grant LMU a security interest in rental agreements having a total defined present value of at least $8.1 million. Tr. 826.16–.20 (SGM), 891.4–.16 (DMC), 1104.20–.24 (DMC), 1111.17–.25 (DMC), 1138.24–1139.13 (DMC), 1184.17–.25 (DMC), 1812.21–.25 (RKP), 2596.17–.25 (COL); exh. 99, 431; *see* ¶ 44, *supra.*

C. *Teltronics' Failure to Deliver a Collateral List for January 1979*

176. Teltronics failed to deliver to LMU collateral list for January 1979, as required by section 5(d) of the Security Agreement. Tr. 850.6–.15 (DMC), 1139.15–.25 (DMC), 1185.9–.23 (DMC), 1738.6–1739.3 (RKP); exh. 431, fol. tab 7; answer ¶ 20.

D. *Teltronics' Failure to Deliver a Financial Trend and Business Report for January 1979*

177. Teltronics failed to deliver to LMU a Financial Trend and Business Report for January 1979 as required by section 5(e)(iv)

of the Security Agreement. Tr. 1139.15–.25 (DMC); answer ¶ 20.

### E. Teltronics' Failure to Mark Leases to Show LMU's Security Interest

178. Teltronics failed to mark the original of each rental agreement subject to the Security Agreement to indicate that a security interest in it had been granted to LMU, as required by section 5(g) of the Security Agreement. Tr. 1793.5–1797.11 (RKP); answer ¶ 20.

### F. Teltronics' Sales of LMU's Collateral

179. In or about February 1977, LMU learned that Teltronics, without LMU's knowledge or consent, had sold to third parties certain rental agreements in which Teltronics had previously granted a security interest to LMU. Tr. 894.6–900.23 (DMC), 2522.19–2525.19 (APL); exh. 28.

180. In a telephone conversation on February 9, 1977, Peter Lawson, an attorney associated with Sullivan & Cromwell, counsel to LMU, told Kleban that the sales of rental agreements referred to in paragraph 179 above were a violation of the Security Agreement and a gross breach of good faith. Tr. 2522.19–2525.19 (APL); exh. 28.

181. In a subsequent telephone conversation on February 9, 1977, Kleban told Lawson that Teltronics agreed that the sales of rental agreements referred to in paragraph 179 above were improper and that Teltronics would explore ways to remedy the situation. Tr. 2525.20–2526.13 (APL); exh. 28.

182. At a meeting on May 5, 1977, Teltronics agreed that it would "review each month with LMU their new portfolio of rentals and leases in order to determine which ones may or may not be discounted for cash flow purposes." Tr. 1036.23–1039.-25 (DMC); exh. 39.

183. On July 27, 1977, Teltronics asked for and obtained LMU's written consent to its sale of six rental agreements subject to LMU's security interest. Tr. 900.24–902.16 (DMC), 1626.11–1627.20 (RKP), 1629.4–.21 (RKP); exh. 40, 41.

184. During the period from May 1978 through February 1979, Teltronics, without seeking or obtaining permission from LMU, sold to Borg-Warner Acceptance Corp. 71 rental agreements in which Teltronics had previously granted a security interest to LMU and LMU had perfected its security interest. Tr. 902.17–903.11 (DMC); exh. 111–19, 121, 124–29, 131–45, 151–52, 154–65, 167, 174–79, 288–90, 292–93, 431–32; complaint ¶ 21(a); answer ¶ 21; see ¶ 46 supra.

185. During the period from October 26, 1978, through November 22, 1978, Teltronics, without seeking or obtaining permission from LMU, sold to Itel Capital Corporation 34 rental agreements in which Teltronics had previously granted a security interest to LMU and LMU had perfected its security interest. Tr. 902.17–903.11 (DMC); exh. 199–204, 209–37, 431–32; complaint ¶ 21(b); answer ¶ 21; see ¶ 46 supra.

186. On or about December 26, 1978, Teltronics, without seeking or obtaining permission from LMU, sold to Manufacturers Hanover Leasing Corporation three rental agreements in which Teltronics had previously granted a security interest to LMU and LMU had perfected its security interest. Tr. 902.17–903.11 (DMC); complaint ¶ 21(c); answer ¶ 21; see ¶ 46 supra.

187. On December 29, 1978, Teltronics, without seeking or obtaining permission from LMU, sold to Piechocki a rental agreement between Teltronics and Credit Bureau of Westchester, Inc., in which Teltronics had previously granted a security interest to LMU and LMU had perfected its security interest. Tr. 902.17–903.11 (DMC), 1797.12–1798.23 (RKP), 1813.7–.25 (RKP); exh. 269, 431–32.

188. Teltronics listed the rental agreement with Credit Bureau of Westchester, Inc., on the December 29, 1978 collateral list notwithstanding that it had sold the rental agreement to Piechocki on that date. Teltronics delivered the collateral list in question to LMU subsequent to December 29, 1978. Tr. 1797.12–1798.10 (RKP); exh. 431, fol. tab 7, at 59–60.

189. On or about June 1, 1978, Teltronics submitted to LMU a collateral list that omitted 25 unexpired rental agreements, having a total defined present value of $458,503, in which Teltronics had previously granted a security interest to LMU. Tr. 1234.8–1235.6 (PL); exh. 310, 312, 431, fol. tab 7, at 35–40.

190. In a letter dated June 28, 1978, and in a subsequent telephone conversation, Costello asked Piechocki why the leases referred to in paragraph 189 above were omitted from the June 1, 1978, collateral list. Tr. at 903.12–908.12 (DMC); exh. 171.

191. In the telephone conversation referred to in paragraph 190, Piechocki told Costello that the omitted leases had either gone cash or been cancelled. To "go cash" or "turn cash" means that the lessee elected to convert the lease into a cash sale. Tr. 905.12–908.12 (DMC), 2256.13–2258.7 (REH).

192. LMU's policy in regard to turning leases to cash, as manifested in its course of dealing with Teltronics, was that it would permit Teltronics to convert a lease to a cash sale and retain the proceeds therefrom where the *lessee* elected to purchase the equipment, tr. 1151.5–1151.18 (DMC), but would not permit Teltronics to discount leases to *third parties* for cash unless specific authorization was obtained from LMU prior to the occurrence of the discounting transaction. *See* ¶¶ 180–183 *supra.*

193. On or about August 31, 1978, Teltronics submitted to LMU a collateral list that omitted 46 unexpired rental agreements having a total defined present value of $609,346 in which Teltronics had previously granted a security interest to LMU. Tr. 1235.24–1236.13 (PL); exh. 310, 312, 431, fol. tab 7, at 41–46.

194. In a letter dated October 18, 1978, and in a subsequent telephone conversation, Costello asked Chanda why the leases referred to in paragraph 193 were omitted from the August 31, 1978, collateral list. Tr. 908.13–910.12 (DMC); exh. 196.

195. In the telephone conversation referred to in paragraph 194, Chanda told Costello that the omitted leases had turned cash. Tr. 910.13–.18 (DMC).

196. On or about October 20, 1978, Teltronics submitted to LMU a collateral list that omitted four unexpired rental agreements having a total defined present value of $121,640 in which Teltronics had previously granted a security interest to LMU. Tr. 911.9–.21 (DMC); exh. 198, 431, fol. tab 7, at 41–42, 44, 47–48, 50.

197. In a letter dated October 26, 1978, Costello asked Chanda why the leases referred to in paragraph 196 had been omitted from the October 20, 1978, collateral list and reiterated his inquiry as to why the leases referred to in paragraph 193 were omitted from the August 31, 1978 list. Tr. 911.22–912.17 (DMC); exh. 198.

198. In a letter dated November 9, 1978, Teltronics advised Costello that the omitted leases referred to in paragraphs 193 and 196 above "have either turned cash or were cancelled." Tr. 912.18–915.11 (DMC); exh. 207.

199. On or about December 29, 1978, Teltronics submitted to LMU a collateral list that omitted 44 unexpired rental agreements having a total defined present value of $1,529,270 in which Teltronics had previously granted a security interest to LMU. Tr. 1236.14–1237.6 (PL); exh. 310, 312, 431, fol. tab 7, at 59–64.

200. On June 19, 1978, August 1, 1978, August 16, 1978, September 15, 1978, October 2, 1978, December 4, 1978, and January 30, 1979, Teltronics submitted statements of actual and projected cash flow to LMU, pursuant to section 5(e) of the Security Agreement, that failed to disclose the cash receipts from the sales of leases subject to LMU's security interest referred to in paragraphs 184–187 above. Tr. 1171.15–1174.14 (DMC); exh. 168, 184, 186, 286, T–124, T–128, T–176.

201. The sales of leases referred to in paragraphs 184–187 above were made without LMU's knowledge. Tr. 165.2–.19 (SGM), 917.11–922.13 (DMC), 924.11–929.4 (DMC), 1034.18–1035.24 (DMC), 1147.9–1151.23 (DMC), 1814.3–1819.12 (RKP), 2256.-

5–2259.13 (REH); exh. 39, 168, 171, 186, 189–90, 193, 196, 198, 206, 257–58, 287, *see* ¶¶ 188–200, *supra.*

202. The sales of leases referred to in paragraphs 184–187 above were made without LMU's consent. Tr. 165.20–170.23 (SGM), 823.5–.10 (SGM), 900.24–914.17 (DMC); 1039.13–1042.11 (DMC), 1168.11–1174.14 (DMC), 1814.3–1819.12 (RKP), 2256.-5–2259.13 (REH), 2522.19–2525.19 (APL); exh. 39, 168, 171, 186, 189–90, 193, 196, 198, 206, 257–58, 287; *see* ¶ 180–183, 192, *supra.*

203. The sales referred to in paragraphs 184–187 above violated the Security Agreement. Exh. 431, fol. tab 1, at 1; *see* ¶¶ 180–183, 192, *supra.*

TELTRONICS' SUBSEQUENT DEFAULTS

204. Teltronics' failure to pay Nordic as required constituted a default under the cross-default provisions of the Citibank Loan Agreement, and on March 6 and 7, 1979, Citibank accelerated its outstanding loan to Teltronics and demanded payment from Teltronics of principal and interest totalling $3,009,643.72. Schedule C, ¶ 39; exh. 333, 338.

205. By means of two letters dated March 5, 1979, LMU notified Teltronics that each of the following constituted an event of default under the Security Agreement: (1) Nordic's declaration that Teltronics was in default and that all its indebtedness to Nordic was forthwith due and payable, (2) Teltronics' failure to deliver to LMU a collateral list for January 1979, (3) Teltronics' failure to deliver to LMU a Financial Trend and Business Report for January 1979, and (4) Teltronics's failure to mark counterparts of the pledged rental agreements to show LMU's security interest therein. Exh. 329, 330.

206. By the same letters to Teltronics dated March 5, 1979, LMU demanded, in accordance with the Security Agreement, that Teltronics:

(a) execute and deliver to LMU a letter acknowledging that Teltronics was in default and directing the lessees under the rental agreements subject to LMU's security interest to make all future rental payments to LMU;

(b) immediately turn over to LMU all payments under such rental agreements that were then in Teltronics's possession or control or which would come into Teltronics' possession or control at any time in the future; and

(c) assemble the collateral subject to the Security Agreement and make it available to LMU at its office in Woodbury, New York. Exh. 329–30; complaint ¶ 24; answer ¶ 24.

207. Teltronics did not comply with any of the demands referred to in paragraph 206 above. Complaint ¶ 24; answer ¶ 24.

TELTRONICS' INDEBTEDNESS TO LMU

208. Commencing at approximately 4:00 p.m. on March 5, 1979, a meeting was held at the offices of Nordic for the purpose of satisfying LMU's guarantee to Nordic on Teltronics' indebtedness. The meeting was attended by Costello of LMU, Radberg, Colligan and Ingvarssen of Nordic, Towne of Sullivan & Cromwell, and Knox and Calder of White & Case (Nordic's attorneys). Tr. 1399.5–1402.5 (LTR).

209. On March 5, 1979, LMU as guarantor paid Nordic the full amount of the principal and interest outstanding under the First, Second, and Third Nordic Agreements, totalling $4,945,360.30. Schedule C, ¶ 37; tr. 1408.23–1410.13 (LTR); exh. T–274.

210. On March 5, 1979, Nordic executed an assignment to LMU of all its rights pursuant to the First, Second, and Third Nordic Agreements and the Nordic Notes. Schedule C, ¶ 38; tr. 1410.14–1411.5 (LTR).

211. On March 6 and 7, 1979, Citibank demanded payment from LMU, pursuant to its guarantee of Teltronics' indebtedness, of the principal and interest due to Citibank from Teltronics, totalling $3,010,655.34. Exh. 339.

212. On March 6–7, 1979, LMU as guarantor paid Citibank the full amount of the loan outstanding under the Citibank Loan Agreement, totalling $3,010,655.34. Schedule C, ¶ 40.

213. On March 6–7, 1979, Citibank executed an assignment to LMU of all its rights pursuant to the Citibank Loan Agreement and the Citibank Note. Schedule C, ¶ 41.

214. Teltronics failed to pay its note payable to LMU dated December 14, 1978, in the amount of $1 million, when it became due on March 31, 1979. Schedule C, ¶¶ 27–28; tr. 180.14–.19 (SGM), 945.15–.17 (DMC), 1166.14–.20 (DMC); see ¶ 83 supra.

215. On April 3, 1979, LMU commenced an action against Teltronics in the Supreme Court of the State of New York, County of Queens, Index No. 4897/79, to recover the amount of the note referred to in paragraph 214 above. Schedule C, ¶ 27.

216. On July 19, 1979, a judgment in the amount of $1,059,098.41 was entered in LMU's favor in the action referred to in paragraph 215 above. Schedule C, ¶ 28.

217. On March 23, 1979, Teltronics owed LMU $88,494.61 on its trade account. Exh. 409, at 3.

218. Teltronics has never paid any part of the indebtedness referred to in paragraphs 209–217 above. Tr. 180.8–.22 (SGM), 945.7–.17 (DMC), 1166.14–.20 (DMC).

219. Teltronics is indebted to LMU in a total amount of $9,103,608.66 plus interest to September 18, 1982. See ¶¶ 209–218, supra.

## LMU DID NOT CONTROL TELTRONICS

220. LMU never owned any stock of Teltronics. Tr. 64.17–.21 (SGM).

221. LMU never had any officers or directors in common with Teltronics. Tr. 64.-22–65.3 (SGM).

222. There is no evidence of any contract or agreement between Teltronics and LMU whereby LMU was empowered to control the management of Teltronics.

223. Subject to the provisions of Paragraph 7(f) of the Security Agreement, as amended, see exh. 431, fol. tabs 1 & 2, exh. 49, and of Section 1.05 of the Citibank loan agreement, as amended, see exh. 1, 13, 17, 29, that required Teltronics to purchase var-

ious quantities of equipment from LMU, Teltronics was free at all times to purchase equipment from sources other than LMU or LME, and it regularly did so. Tr. 61.23–64.-16 (SGM), 850.6–.25 (DMC); exh. 111, 114, 116–19, 124–25, 127–28, 131–45, 151–52, 157–62, 164–65, 167, 176, 179, 292–93, 310, 312.

224. Subject to the provisions of Section 4.02(a) of the Citibank loan agreement, as amended, which restricted Teltronics' right to obtain additional secured financing, see exh. 58, Teltronics was free at all times to obtain financing from sources other than LMU, and it regularly did so. Tr. 325.22–326.20 (SGM), 332.18–333.6 (SGM), 1679.22–1686.3 (RKP); exh. 122, 182, T–96, T–110, T–147; see ¶¶ 64–67, supra.

225. LMU did not control Teltronics. See ¶¶ 81, 131–136, 169–171, 175–203, 220–224, supra.

## THE NEW YORK DIVISION

226. On March 5, 1979, Costello sent a letter to each of the lessees on Teltronics' December 29, 1978 collateral list and to 119 additional lessees that were on previous Teltronics' collateral lists, stating that Teltronics was in default and that all future rental payments would have to be made to LMU. Tr. 2298.12–2302.11 (REH), 1144.-9–.21 (DMC); exh. 332. The letter advised Teltronics' customers that LMU would thereafter provide full service for their telephone equipment. Exh. 332. It also stated: "We at Ericsson look forward to servicing your present and future telephone system needs." Id.

227. Subsequent to March 5, 1979, LMU was required to provide service for customers whose rental agreements were subject to its security interest in order to protect the value of its collateral. LMU set up a "New York Division," under the direction of Costello and Halvorsen, to provide such service. Tr. 170.24–171.21 (SGM), 931.16–933.12 (DMC), 2300.20–2301.11 (REH), 2332.12–2333.22 (REH), 2335.13–.17 (REH).

228. Subsequent to March 5, 1979, Teltronics refused to provide service for many of its customers whose rental agreements

were subject to LMU's security interest and Teltronics told many customers who requested service from Teltronics to obtain service from LMU. Tr. 170.24–171.21 (SGM), 933.3–944.11 (DMC), 2300.20–2301.11 (REH), 2332.12–2333.22 (REH), 2335.13–.17 (REH); exh. 352, 355, 358–61, 365, 367, 371, 375, 389.

229. The New York Division established a force of salesmen and service personnel, and hired, but did not solicit, twelve former Teltronics employees. The division serviced and billed approximately one hundred of Teltronics' former customers, more than half of which appeared on the final two collateral lists submitted to LMU, in the period through September 30, 1979. Tr. 172.21–180.7 (SGM), 933.20–934.12 (DMC), 2306.13–2307.23 (REH); exh. 386–388; see "Plaintiff's Further Response to Defendant's First Request for Production of Documents," sealed pursuant to the court's Protective Order dated November 12, 1982.

230. LMU never solicited any current customers of Teltronics to become customers of LMU. Tr. 172.21–180.7 (SGM), 2306.13–2307.23 (REH).

231. Since its inception, the New York Division has continually suffered net operating losses. Tr. 944.12–945.6 (DMC).

THE VALUE OF THE COLLATERAL

232. By an order dated March 27, 1980, as amended by an order dated May 2, 1980, and a stipulation between LMU and defendant dated May 28, 1980, and approved by the court, Judge Goetz authorized the sale by auction of all the rental agreements subject to LMU's security interest under the Security Agreement except for two rental agreements that had been converted to cash sales and one rental agreement that Teltronics had sold to a third party. Exh. 415, 417, 418.

233. Pursuant to the orders and stipulation referred to in paragraph 232 above, certain rental agreements subject to LMU's security interest under the Security Agreement were sold at auctions on May 28 and July 16, 1980. Schedule C, ¶ 46; exh. 419, 422.

234. Pursuant to the order of Judge Goetz dated March 27, 1980, LMU was permitted to offset its successful bids at the auctions referred to in paragraph 233 above against its claim against Teltronics. Exh. 415, 419, 422.

235. The auctions referred to in paragraph 233 above yielded total cash proceeds of $378,509, an offset against LMU's claims against Teltronics of $1,878,413, and expenses and sales tax obligations of $19,201.92. Exh. 419, 422.

236. Between March 5, 1979 and the dates of the respective auctions, LMU received rents paid pursuant to certain rental agreements subject to its security interest. Tr. 1219.16–1221.5 (KO).

237. Pursuant to the order of Judge Goetz dated March 27, 1980, LMU deposited with Sullivan & Cromwell as escrow agents all the rents referred to in paragraph 236 above, all the net cash proceeds of the auctions referred to in paragraph 233 above, and all other cash received on account of collateral subject to its security interest under the Security Agreement that was in the possession of Teltronics or the trustee. Tr. 1219.16–1221.13 (KO); exh. 415.

238. The amounts deposited in escrow referred to in paragraph 237 above, totalled $979,720.59, including amounts collected on account of sales tax. Exh. 424.

239. Substantially all the collateral subject to plaintiff's security interest in the possession of plaintiff or defendant has been liquidated by auction or otherwise. Schedule C, ¶ 46.

240. The collateral subject to plaintiff's security interest has a total value of less than $3 million. See ¶¶ 232–239, supra.

CONCLUSIONS OF LAW

I. *LMU Has a Perfected Security Interest in the Collateral Subject to the Security Agreement*

Under the terms of the Security Agreement, LMU has a security interest in the collateral described in paragraph 40 above, securing all indebtedness of Teltronics to

LMU. Exh. 431. LMU alleges that it duly perfected its security interest in all the various rental agreements subject to the Security Agreement by either: (1) filing financing statements pursuant to section 9–401(1)(c) of the New York Uniform Commercial Code (U.C.C.) in the department of state and in the county where Teltronics maintained its principal office, or (2) taking possession of the rental agreements pursuant to U.C.C. § 9–305. *See* ¶¶ 46–49, *supra.*

The trustee contends that LMU did not properly perfect its security interest in the telephone equipment leased under 55 of the rental agreements because it did not file financing statements in the counties where the equipment was installed. If the equipment in question constituted "fixtures," as that term is defined in U.C.C. § 9–313(1)(a), the filing requirements specified in U.C.C. § 9–401(1)(b) would be controlling. In such event, the proper place for LMU to have filed would have been "in the office where a mortgage on the real estate concerned would be filed, recorded or registered, *viz.,* in the office of the recording officer in the county where the real estate is located." N.Y.U.C.C. § 9–401(1)(b) (McKinney Supp. 1982–83). If, on the other hand, the telephone equipment did not constitute fixtures, LMU could have perfected its security interest pursuant to U.C.C. § 9–401(1)(c) by filing in the department of state and in the county where Teltronics maintained its place of business. N.Y.U.C.C. § 9–401(1)(c) (McKinney Supp. 1982–83).

Section 9–313(1)(a) provides that "goods are 'fixtures' when they become so related to particular real estate that an interest in them arises under real estate law." N.Y.U.C.C. § 9–313(1)(a) (McKinney Supp. 1982–83). Under New York law, "[m]achinery normally is personal property and is not deemed a fixture except where it is installed in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature." *In re City of New York (Whitlock Ave),* 278 N.Y.

276, 281–82, 16 N.E.2d 281, 282 (1938); *accord, Belinsky v. State of New York,* 24 A.D.2d 908, 264 N.Y.S.2d 401 (3rd Dep't 1968).

Under the above-cited legal precepts, the telephone equipment in question did not constitute fixtures. Indeed, Teltronics' entire program of leasing telephone equipment was premised on the assumption that the equipment could be removed from the customers' premises at the expiration of the respective lease terms. Since no fixture filing was required, the court concludes that LMU properly perfected its interest in the collateral in question by filing, in accordance with section 9–401(1)(c) of the U.C.C., in the department of state and in the county where Teltronics maintained its principal office. *See* ¶¶ 46–49, *supra.*

II. *Teltronics Was In Default of the Nordic Loan Agreements Prior to Nordic's Declaration of Default and Acceleration on March 5, 1979*

Among the events of default specified in paragraph 7 of the General Conditions incorporated into the Nordic Loan Agreements, exh. 42, 46, 106, is the following:

(b) Any payment of interest on any such Loan made by the Bank . . . shall not be paid within two Business Days after the date when due . . .

\* \* \* \* \* \*

then and in . . . such event, and at any time thereafter if any such event shall then be continuing, the Bank, at its option (without the intervention of any judicial or administrative or other governmental authority), may by notice to the Borrower declare the principal of and accrued interest on the Loan(s) then outstanding to be forthwith due and payable, whereupon the principal of and accrued interest on the Loan(s) shall become forthwith due and payable without demand or other notice or legal formalities of any kind (all of which are hereby expressly waived by the Borrower), and the Borrower shall forthwith pay the entire amount of said principal and interest,

anything contained in the agreement to the contrary notwithstanding.

Pursuant to the above provisions, Teltronics' failure to make the Nordic interest payment of February 28, 1979 constituted a default of the loan agreements as of the close of business on March 2, 1979. Thus, Teltronics was already in default of the loan agreements when Nordic served Teltronics with a formal declaration of default and acceleration on March 5, 1979.

III. *Teltronics Was in Default of the Security Agreement Before LMU Began to Exercise its Rights Thereunder on March 5, 1979*

Under the express terms of Paragraph 7(a) of the Security Agreement, as amended, exh. 431, fol. tabs 1–6, a default by Teltronics under the Nordic loan agreements constituted an event of default under the Security Agreement. When Teltronics went into default of the Nordic loan agreements as of the close of business on March 2, 1979, it contemporaneously went into default of the Security Agreement. Thus, Teltronics was already in default of the Security Agreement when LMU began exercising its rights thereunder on March 5, 1979.

IV. *Certain Admissions of Teltronics' Officers are Admitted into Evidence Over the Trustee's Objection*

During the course of trial, plaintiff offered into evidence conversations between Lawson and Kleban, and between Costello and Chanda, for the purpose of demonstrating the understanding of the parties as to whether Teltronics was permitted to discount leases to third parties. *See* ¶¶ 179–203, *supra*. The trustee objected on hearsay grounds, and maintained that the statements made by Teltronics' officers during the conversations were not binding admissions on the trustee. The court reserved decision on the objection. *See* Tr. 894.6–899.17, 2522.19–2523.22.

■ Plaintiff argues that the trustee is in privity with the officers of Teltronics, and that the Second Circuit has long recognized privity as a basis for holding a trustee bound by admissions of the debtor made prior to bankruptcy, *see In re Weissman,* 19 F.2d 769 (2d Cir.1927). However, Rule 801(d)(2)(D), which took effect on July 1, 1975, "rejects privity as a ground of admissibility by making no provision for it." 4 Weinstein's Evidence 801–165 (1979), *accord, Calhoun v. Baylor,* 646 F.2d 1158 (6th Cir.1981); *Huff v. White Motor Corp.,* 609 F.2d 286 (7th Cir.1979). Thus, in order to be admissible, statements formerly recognized as privity-based admissions must fall within another recognized hearsay exception.

■ Rule 803(24), which operates as a residual exception to the hearsay rule, provides as follows:

Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

The conversations in question fall within the above exception since they are offered as evidence of a material fact, to wit: the parties' understanding as to the propriety of discounting leases, and are more probative on the issue of whether the alleged violations occurred than any other evidence which could be procured through reasonable efforts. The statements have circumstan-

tial guarantees of trustworthiness inasmuch as they were against interest when made, and should be admitted into evidence. Moreover, the trustee was on notice that these conversations would be offered into evidence. *See* Pre-trial Order at 34–35. Accordingly, the trustee's objection is overruled.

## V. *The Trustee's Affirmative Defenses are Without Merit*

### A. *Estoppel*

The trustee asserts as an affirmative defense that LMU is estopped to assert its claim against Teltronics on the grounds that LMU allegedly: (1) induced Teltronics to default under the Nordic loan agreements by representing to Teltronics that it would not be required to make the Nordic interest payment on February 28, 1979, and (2) promised Teltronics at the time of the Loral overture that LMU would make available a $4 million line of credit, which it never in fact made available, in order to induce Teltronics to reject the Loral proposal.

■ An estoppel " 'rests upon the word or deed of one party upon which another rightfully relies and so relying, changes his position to his injury.' " *Triple Cities Constr. Co. v. Maryland Casualty Co.,* 4 N.Y.2d 443, 448, 151 N.E.2d 856, 858, 176 N.Y.S.2d 292, 295 (1958) (quoting *Metropolitan Life Ins. Co. v. Childs Co.,* 230 N.Y. 285, 292, 130 N.E. 295, 298 (1921)). A defendant asserting a claim of estoppel must demonstrate "in what manner and to what extent, defendant relied on plaintiff's inconsistent conduct and was prejudiced thereby." *Glenesk v. Guidance Realty Corp.,* 36 A.D.2d 852, 853, 321 N.Y.S.2d 685, 687–88 (2d Dep't. 1971) (citation omitted); *accord, Lynn v. Lynn,* 302 N.Y. 193, 205, 97 N.E.2d 748, 754, *cert. denied,* 342 U.S. 849, 72 S.Ct. 72, 96 L.Ed. 640 (1951).

■ Under the facts presented at trial, the court finds that LMU never represented to Teltronics that it would not be required to make timely payment of the interest due to Nordic on February 28, 1979, and Tel-tronics did not rely on any representations or deeds of LMU in failing to pay the Nordic interest, *see* ¶¶ 160–171, *supra.* In addition, there is no credible evidence tend-ing to show that LMU promised during the Loral overture that it would make available a $4 million line of credit, or that Teltronics relied on any such representations or deeds of LMU in rejecting the Loral proposal, *see* ¶¶ 108–117, *supra.* Therefore, the trustee's estoppel defense is without merit.

### B. *Unclean Hands*

■ The second affirmative defense asserted by the trustee is that LMU may not invoke the equitable powers of this court because it has had unclean hands in its dealings with Teltronics. Since this defense is premised upon the same alleged course of inequitable conduct that underlies the trustee's counterclaim for equitable subordination, reference is made to that portion of this decision. Upon consideration of all the evidence, the court concludes that LMU's conduct toward Teltronics was neither inequitable nor unconscionable. Rather, LMU's actions were generally motivated by a legitimate desire to protect its security interest in the collateral when it became apparent that Teltronics would be unable to meet its financial obligations under the loan agreements. *See generally,* ¶¶ 54–98, 131–152, 175–203, *supra.* Accordingly, the unclean hands defense must fall.

### C. *Commercial Reasonableness and Good Faith*

■ The trustee asserts as a further affirmative defense that the steps taken by LMU to enforce its security interest in the collateral were not commercially reasonable within the meaning of Article 9 of the Uniform Commercial Code. Section 9–502(2), which relates *inter alia* to the right of a secured party who has recourse to the debtor and undertakes to collect from account debtors "must proceed in a commercially reasonable manner." N.Y.U.C.C. § 9–502(2) (McKinney 1964 & Supp. 1982–83). The court has found that Teltronics was in default of the Security Agreement

on and before March 5, 1979. Thus, pursuant to sections 9–503 and 9–504 of the U.C.C., LMU had the right to duly take possession and dispose of its collateral. LMU took possession of its collateral by making a formal demand on Teltronics for a turnover of the same, and by sending letters to the lessees informing them that: (1) Teltronics had defaulted on the Nordic loans, (2) LMU was therefore entitled to receive all payments under their respective leases, and (3) LMU would thereafter perform all service obligations. *See* ¶¶ 206, 226, *supra*.

LMU's action in sending the letters to the lessees was not a commercially unreasonable manner of enforcing its rights under the Security Agreement. Section 3(a) of the Security Agreement expressly authorized LMU to notify the lessees to make payment to it in the event of a default by Teltronics. Exh. 431. The statement by LMU in the aforesaid letters that Teltronics had defaulted was an accurate recitation of existing fact. Moreover, LMU's timely notice thereof to the lessees, together with its assurance of uninterrupted service, tended to maximize and preserve the value of the collateral.

Section 9–504 of the Uniform Commercial Code, which relates to the secured party's right to dispose of collateral following default, provides that he may sell the property "in its then condition or following any commercially reasonable preparation," and that "every aspect of the disposition . . . must be commercially reasonable." N.Y.U.C.C. § 9–504(1), (3) (McKinney 1964 & Supp. 1982–83). The collateral in question was sold at auctions held on May 28, 1980 and July 16, 1980 in accordance with procedures approved by Judge Goetz. *See* ¶¶ 232–235, *supra*. Pursuant to section 9–507(2), "[a] disposition which has been approved in any judicial proceeding . . . shall conclusively be deemed to be commercially reasonable. . . ." N.Y.U.C.C. § 9–507(2) (McKinney 1964). Accordingly, the court rejects the trustee's contention that LMU acted in a manner that was commercially unreasonable.

■ The trustee additionally asserts that the self-help measures taken by LMU violated the wholly distinct duty of good faith imposed by section 1–203 of the Uniform Commercial Code. That section provides that "[e]very contract or duty within [the U.C.C.] imposes an obligation of good faith in its performance or enforcement." N.Y.U.C.C. § 1–203 (McKinney 1964). The obligation of parties to commercial transactions to act in good faith is defined as requiring "honesty in fact." N.Y.U.C.C. § 1–201(19) (McKinney 1964). For the reasons exposited in the following portion of this decision, the court concludes that the actions taken by LMU were not the result of illicit motives. LMU did not breach its statutory duty of good faith toward Teltronics.

## VI. *Equitable Subordination is not Warranted Under the Facts Presented*

### A. *The Court's Power of Equitable Subordination*

■ It is axiomatic that bankruptcy courts are generally guided by the principle of equality of distribution. *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941); *Matter of Multiponics, Inc.,* 622 F.2d 709, 721 (5th Cir.1980). Notwithstanding this fundamental objective, the courts "possess the power 'to prevent the consummation of a course of conduct by [a] claimant which . . . would be fraudulent or otherwise inequitable' by subordinating his claims to the ethically superior claims asserted by other creditors." *Matter of Mobile Steel Co.,* 563 F.2d 692, 699 (5th Cir.1977) (quoting *Heiser v. Woodruff*), 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946); *accord, Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *DeMet v. Harralson,* 399 F.2d 35, 38 (5th Cir.1968). In this regard, the Supreme Court has held that in exercising its equitable jurisdiction, "the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton, supra* at 308.

■ The power to subordinate claims under the Bankruptcy Act of 1898 does not derive from express statutory grant; rather, it is rooted in the broad equity powers vested in the bankruptcy courts. *Matter of Mobile Steel Co., supra* at 698–99; *Matter of Multiponics, supra* at 713; *In re American Lumber Co.,* 5 B.R. 470, 478 (D.Minn. 1980). Parenthetically, it should be noted that the subordination power has been codified in the Bankruptcy Reform Act of 1978. *See* 11 U.S.C. § 510 (Supp. III 1979). As repositories of equitable discretion, *see Heiser v. Woodruff, supra* at 732–33; *Pepper v. Litton, supra* at 303–11; *Local Loan Co. v. Hunt,* 292 U.S. 234, 239–41, 54 S.Ct. 695, 696–97, 78 L.Ed. 1230 (1934), bankruptcy courts are free to adjudicate matters according to equitable doctrines and principles except insofar as they are inconsistent with applicable statutory provisions. *Young v. Higbee Co.,* 324 U.S. 204, 214, 65 S.Ct. 594, 599, 89 L.Ed. 890 (1945); *S.E.C. v. U.S. Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940); *Amer. United Mut. Life Ins. Co. v. City of Avon Park, Fla.,* 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940).

B. *Standards Governing Equitable Subordination*

■ In order to subordinate a claim, the bankruptcy court must ultimately find that the claimant at the very least violated the "rules of fair play and good conscience" in his dealings with the debtor and its creditors. *Pepper v. Litton, supra* at 310; *Matter of Ahlswede,* 516 F.2d 784, 788 (9th Cir.1975); *see Matter of Mobile Steel Co., supra* at 695. However, as the Fifth Circuit made clear in *Matter of Mobile Steel Co.,* equitable subordination is an extraordinary remedy and certain conditions must be satisfied before the exercise of the subordination power becomes appropriate:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act [or the present Code].

563 F.2d at 699–700 (citations omitted); *accord, Matter of Multiponics, supra* at 713; *In re American Lumber Co., supra* at 478; *In re Lockwood,* 14 B.R. 374, 380, 8 B.C.D. 128, 132 (Bkrtcy.E.D.N.Y.) *aff'd.,* No. 81–3462, slip op. (E.D.N.Y. March 18, 1981); *In re Castillo,* 7 B.R. 135, 138, 3 C.B.C.2d 351, 355 (Bkrtcy.S.D.N.Y.1980).

■ In applying the above tripartite test, certain guiding principles must be considered. First, the inequitable conduct of the claimant need not have been related to the acquisition or assertion of his claim in order to warrant subordination. *Matter of Mobile Steel Co., supra,* at 700–01; *see generally Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *contra, In re Ahlswede, supra* at 788. The inequity "may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate...." *In re Kansas City Journal-Post Co.,* 144 F.2d 791, 803–04 (8th Cir.1949).

■ Second, since equitable relief is by its very nature remedial rather than penal, a claim should be equitably subordinated only to the extent necessary to offset the harm suffered by the debtor and its creditors as a result of the inequitable conduct. *Matter of Mobile Steel Co., supra* at 701; *accord, In re Westgate-California Corp.,* 642 F.2d 1174, 1178 (9th Cir.1981); *Farmers Bank v. Julian,* 383 F.2d 314, 323 (8th Cir. 1967).

■ Finally, the burden of proving all the elements of subordination is on the objectant. *See generally* 3 L. King, Collier on Bankruptcy, ¶ 57.18, at 296–97 (14th ed. 1977). If the validity of the underlying claim is in issue, the claimant has the burden of proving both the amount and legitimacy of his claim. *See* 3 L. King, Collier on Bankruptcy, at 502–25 (15th ed. 1982); *cf. Matter of Mobile Steel Co., supra* at 701

(holding that although objectant has the burden of going forward to overcome claimant's *prima facie* case, claimant bears ultimate burden of proving the validity and honesty of his claim). However, once that burden has been satisfied, the objectant must prove by a preponderance of the evidence that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted. *See generally,* 3 L. King, Collier on Bankruptcy, ¶ 57.18, at 296–97 (14th ed. 1977).

### C. *Equitable Subordination is Not Limited to Claims of Fiduciaries*

■ A point of much contention between the parties in the present case is whether the power of equitable subordination may be appropriately exercised in the absence of a fiduciary relationship between the claimant and the bankrupt. The overwhelming majority of subordination cases involve the claims of fiduciaries. For example, courts have subordinated the claims of shareholders, officers and directors of bankrupt companies where the claimants were found to have engaged in fraud, mismanagement, self-dealing or other breaches of trust. *See e.g., Pepper v. Litton, supra; Taylor v. Standard Gas & Elec. Co., supra; Matter of Multiponics, supra; DeMet v. Harralson, supra; Corley v. Cozart,* 115 F.2d 119 (5th Cir.1940); *In re Roberts, Inc.,* 15 B.R. 584 (Bkrtcy.D.R.I.1981). However, the subordination doctrine has never been strictly limited to fiduciaries. In the case of *In re W.T. Grant Co.,* Bankruptcy Judge John J. Galgay accurately summarized the law as follows:

> The remedy of equitable subordination has been applied only sparingly and is not to be used unless the claimant sought to be subordinated (a) has acted in a fiduciary capacity; (b) has breached a fiduciary duty; (c) that breach resulted in detriment to those claimants to whom a duty was owed *or (d) committed an act of moral turpitude, causing damages to other creditors.*

4 B.R. 53, 74 (Bkrtcy.S.D.N.Y.) (citations omitted) (emphasis added), *aff'd,* 20 B.R. 186, (S.D.N.Y.), *aff'd,* 699 F.2d 599 (2d Cir. 1983); *accord, In re Bowman Hardware & Elec. Co.,* 67 F.2d 792, 794 (7th Cir.1934); *Crowder v. Allen-West Commission Co.,* 213 F. 177, 184 (8th Cir.1914); *In re Roberts, Inc., supra* at 586.

■ The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. *See In re W.T. Grant Co., supra* at 74–75. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." *Id.* Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny. *Pepper v. Litton, supra* at 306–08; *Matter of Mobile Steel Co., supra* at 701–02. If the objectant comes forward with sufficient substantiations of misconduct on the part of the insider claimant, the burden will shift to the insider to establish that each of his challenged transactions with the debtor had all the earmarks of an arm's length bargain. *Pepper v. Litton, supra* at 306; *In re Mobile Steel Co., supra* at 701; *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256, 263 (N.D.N.Y.1968).

### D. *Holding Creditors to a Fiduciary Standard*

■ A creditor is not ordinarily a fiduciary of either his debtor or fellow creditors, and owes them no special obligation of fidelity in the collection of his claim. *In re W.T. Grant Co.,* 699 F.2d 599, 609–10 (2d Cir.1983); *Weinberger v. Kendrick,* 698 F.2d 61, 78–79 (2d Cir.1982); *Crowder v. Allen-West Commission Co., supra* at 184; *see Ingram v. Lehr,* 41 F.2d 169, 170 (9th Cir.1930). Apart from the provisions of

bankruptcy law, such as the automatic stay on collection activity, a creditor normally has an unqualified right to call a loan when due, to refuse to extend a loan for any cause or no cause at all, and to lawfully enforce collection. *In re Prima Co.,* 98 F.2d 952, 965 (7th Cir.1938); *accord, In re W.T. Grant Co.,* at 610 (2d Cir.1983). The Second Circuit has recently held that:

> The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims.

*In re W.T. Grant Co.,* at 610 (2d Cir.1983).

■ The general rule that a creditor is not a fiduciary of his debtor is not without exception. In the rare circumstance where a creditor exercises such control over the decision-making processes of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard. *See In re Prima Co., supra* at 965 (7th Cir.1938); *cf: Weinberger v. Kendrick, supra* at 78–79 (objectants face "serious difficulties" in establishing fiduciary relationship between lending bank and the security holders of a borrowing corporation; while such a development is not beyond realm of possibility, it requires "significant extension of existing procedures"). Accordingly, several commentators have admonished creditors to avoid becoming overly involved in the debtor's management:

> Where the creditor controls the corporate debtor by voting control of its stock, dominant influence in its management or ability otherwise to control its business affairs, the creditor may have a fiduciary duty to its corporate debtor.

> \* \* \* \* \* \*

> ... [W]henever a creditor interferes in the business affairs of a financially troubled corporate debtor, it risks the possibility that such interference may provide a basis for the equitable adjustment of its claims against the debtor, the imposition of statutory liability or the imposition of liabilities at common law.

Douglas-Hamilton, *Creditor Liabilities Resulting from Improper Interference with the Management of a Financially Troubled Debtor,* 31 Bus.Lawy. 343, 352, 365 (1975).

> ... [O]nce the creditor is not satisfied with simply insulting himself from the risk of loss of capital and interest, and instead insists upon affirmative participation in the entreprenurial effort being financed ... he has entered into a relationship whose expected extraordinary economic benefit justifies the requirement of special obligations.

> \* \* \* \* \* \*

> With affirmative conduct thus has come voluntary assumption of duty, and the fact that the creditor's motives are not altruistic will strengthen arguments for the imposition of liability.

Bartlett & Lapatin, *The Status of a Creditor as a Controlling Person,* 28 Mercer L.Rev. 639, 655–57 (1977).

While it is possible for a creditor to be cast in the role of a fiduciary, several cases are illustrative of the difficulty in demonstrating that the claimant so dominated the will of the debtor to the detriment of the other creditors that his claim should be relegated to inferior status. In affirming the subordination of a claim asserted by a creditor bank, the district court in *In re American Lumber, supra* at 478, found "overwhelming" evidence that the bank purposefully manipulated the bankrupt's operations in a manner detrimental to the debtor's unsecured creditors. Among the indicia of control deemed sufficient to manifest a complete domination of will were the following: (1) the bank had the right to a controlling interest in debtor's stock pledged as collateral in the event of default in certain loan obligations; (2) the bank, which was the debtor's sole source of credit, placed the debtor within its coercive powers by refusing to honor the debtor's payroll checks, and by foreclosing on its security

interests in the debtor's only source of ready cash, to wit, its accounts receivable and contract rights; and (3) the bank forced compliance with its wishes by imposing such harsh measures on the debtor as: forcing termination of most employees, requiring drastic reduction of officers' salaries, coercing execution of security agreements on the debtor's only remaining assets, and determining which creditors were to be paid by the debtor. *Id* at 478–79.

Another case in which a non-insider creditor was held to a fiduciary standard is *In re Process-Manz Press Inc.,* 236 F.Supp. 333 (N.D.Ill.1964), *rev'd on jurisdictional grounds,* 369 F.2d 513 (7th Cir.1966). The claimant in that case had a possessory pledge of substantially all the bankrupt's common stock, endorsed in blank. The bankrupt had assigned all its receivables to the claimant, and the claimant collected the proceeds and supplied funds for the bankrupt's payroll and other expenses. The court found the control exercised over the bankrupt was so pervasive that the claimant was "in substance the owner" of the bankrupt, and therefore a fiduciary. *Id* at 348–49. Since the creditor was found to have engaged in unfair, inequitable and fraudulent conduct to the detriment of the debtor, its claims were equitably subordinated.

In contrast, the Seventh Circuit held in *In re Prima,* 98 F.2d 952 (7th Cir.1938), that the bankrupt's acquiescence in its bank's recommendation to hire a particular general manager was insufficient to constitute a domination of its will even though the bank threatened to call its outstanding loans in the event the debtor failed to comply. The court reasoned that because the bank was a nonfiduciary, its threat to call the outstanding loans did not constitute overreaching but rather was the lawful exercise of a legal right. *Id* at 965.

In the *W.T. Grant* case, *supra,* the objectants sought to have the claims of creditor banks subordinated where it was alleged that the banks influenced several of the debtor's key financial decisions. Judge Galgay, in recognizing that the courts have

denied the application of equitable subordination even where a creditor exercises a significant degree of daily monitoring of its debtor, *see e.g., Crowder v. Allen-West Commercial Co., supra; Ingram v. Lehr, supra,* rejected objectants' argument on the theory that the actions taken by the debtor "reflected independent policy decisions and not rigid submission to the dictates of the Bank claimants." 4 B.R. at 77. In affirming Judge Galgay's decision, the Second Circuit found nothing improper about the banks' "careful watch" of the bankrupt's activities, and suggested that the banks indeed would have been derelict in their duty to their own creditors and equityholders if they had not done so. *In re W.T. Grant Co., supra,* at 610–11.

■ The cases cited above strongly suggest that a non-insider creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become, in effect, the *alter ego* of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace. *See Rader v. Boyd,* 252 F.2d 585, 587 (10th Cir.1958).

In analyzing the "control" element, it should be borne in mind that equitable subordination is an umbrella doctrine that encompasses a great variety of disparate factual situations and legal theories. For example, objectants in various cases have sought to invoke the doctrine by alleging: (1) undercapitalization, *e.g., In re Mobile Steel Co., supra; In re Branding Iron Steak House,* 536 F.2d 299 (9th Cir.1976); (2) self-dealing by insiders, *e.g., Matter of Multiponics, Inc., supra; DeMet v. Harralson, supra; Corley v. Cozart, supra;* (3) *de facto* control plus mismanagement or other inequitable conduct, *e.g., Taylor v. Standard Gas & Elec. Co., supra; Ingram v. Lehr, supra;* (4) acts of moral turpitude perpetrated against the debtor's creditors, *e.g., In re Bowman Hardware & Elec. Co., supra; Ingram v. Lehr, supra;* and (5) false claims, *e.g., Pepper v. Litton, supra; In re Lockwood, supra; but see* Herzog & Zweibel,

*The Equitable Subordination of Claims in Bankruptcy,* 15 Vand.L.Rev. 82, 85–88 (distinguishing equitable subordination from disallowance of claim). Elements of subordination, such as control, that are applicable in one context may have no bearing in another context.

▇▇▇ The remedy of equitable subordination must remain sufficiently flexible to deal with manifest injustice resulting from violation of the rules of fair play. *See Pepper v. Litton, supra.* To find that control is required in all subordination cases involving the claims of non-insiders would unduly and unnecessarily limit the reach of the equitable subordination doctrine. In the words of the Fifth Circuit in *Matter of Multiponics,* "[w]here ingenuity spawns unprecedented vagaries of unfairness, [the bankruptcy courts] should not decline to recognize their marks, nor hesitate to turn the twilight for [the offending claimant] into a new dawn for other creditors." 622 F.2d at 722.

E. *Discussion*

(1) *LMU Owed No Fiduciary Obligation to Teltronics or Its Creditors*

▇▇ In the present case, it is clear that LMU did not exercise any direct control over Teltronics. It owned no stock, had no contractual right to participate in management, and shared no common officers or directors with Teltronics. *See* ¶¶ 220–222, *supra.* Moreover, LMU did not control Teltronics indirectly. The facts established at trial suggest merely that Teltronics was required, under loan agreements entered into at arm's length, to purchase various quantities of equipment from LMU and to restrict its additional outside secured financing to a predetermined level for as long as the LMU-guaranteed loans remained outstanding. *See* ¶¶ 223–225, *supra.* The trustee maintains that these contractual constraints effectively gave LMU control over the bankrupt's financial lifeline. However, such covenants are neither unconscionable nor unusual in loan agreements of the magnitude of those in question. In addition, Teltronics was at all

times free to purchase equipment and obtain secured financing from sources other than LMU, and it regularly did so. *See* ¶¶ 223–224, *supra.*

Other manifestations of control suggested by the trustee are: (1) LMU's imposition of C.O.D. payment terms during the equity negotiations, (2) LMU's refusal to provide additional guaranteed financing, and (3) LMU's input into Teltronics' budgetary matters. In the first place, LMU's decisions to impose C.O.D. payment terms on Teltronics and to decline to provide additional financing were based on sound business judgment. LMU cannot be expected to have permitted the rampant growth in Teltronics' trade account balance to continue indefinitely. *See* ¶¶ 78–90, *supra.* It was neither contractually nor ethically bound to continue to provide goods on credit or to arrange for further guaranteed financing. *See W.T. Grant Co., supra,* No. at 610 (2d Cir.1983); *In re Prima, supra* at 965. Indeed, LMU's continued financial support of Teltronics in the face of the large trade account balance, numerous deferrals of principal and interest payments on LMU-guaranteed loans, and shortage of collateral base, evidence extreme forbearance on the part of LMU. While the decision to place Teltronics on C.O.D. terms was coincident with LMU's equity negotiations with Teltronics, and may have had the effect of increasing the pressure on Teltronics to accept its equity proposal, LMU was not shown to have intended this result. The court finds no such ulterior motive.

Although it is evident that LMU kept careful watch of Teltronics' financial position, and in fact recommended that Teltronics scale down its growth projections in accordance with LMU's decision to phase out LMU-guaranteed financing, *see* ¶ 57, *supra,* such actions fall well short of undue entanglement with the bankrupt's operations. There is nothing inherently wrong with a creditor carefully monitoring his debtor's financial situation, *see In re W.T. Grant, supra,* at 610–11, or with suggesting what course of action the debtor ought to follow. *See In re Prima, supra.* Accord-

ingly, the court finds that LMU's relationship with Teltronics did not transcend that of debtor and creditor, and that LMU should not be held to a fiduciary standard.

### (2) *LMU's Alleged "Inequitable Conduct"*

 Having found that LMU was not a fiduciary of the bankrupt or its creditors, it was incumbent upon the trustee to demonstrate that LMU engaged in very substantial misconduct tantamount to fraud, overreaching or spoliation, which caused other creditors of Teltronics to suffer damages. *See In re W.T. Grant, supra,* 4 B.R. 74–75. The trustee maintains that he has met this burden by showing that LMU: (1) employed financial sanctions, such as C.O.D. payment terms, in an effort to coerce Teltronics to sell LMU a substantial equity interest at less than market value; (2) fraudulently induced Teltronics to discourage the overtures of other potential investors by promising that additional financing would be made available; (3) failed to arrange for a $500,000 loan that had been promised for September, 1978; (4) planned a detailed default scenario wherein LMU, as guarantor, would *inter alia:* repay the Nordic and Citibank loans, take possession of the collateral, attach the assets of Teltronics, force Teltronics into bankruptcy, and employ former Teltronics' employees in establishing a sales and service division in Teltronics' marketing area; (5) conspired with Nordic to contrive a default by Teltronics under the Nordic loan agreement; (6) fraudulently induced Teltronics into believing that the Nordic interest payment due on February 28, 1979 had been deferred to March 31, 1979; and (7) established a New York Division, which recruited former Teltronics' employees, and made direct sales of equipment to a number of Teltronics' former customers.

Despite an artful presentation by counsel, the trustee's case falls short of establishing such egregious conduct as would justify equitable subordination of the claim of a non-insider. After considering the evidence, the court is convinced that LMU's actions were generally motivated by sound business judgment rather than by the illicit takeover scheme depicted by the trustee. The record, as summarized in the Findings of Fact above, demonstrates that Teltronics was aware that its Nordic interest payment was due on February 28, 1979, and that it failed to make that payment. *See* ¶¶ 160–168, *supra.* Once Nordic declared a formal default on March 5, 1979, it was entirely proper for LMU to take possession of and service the leases subject to its Security Agreement.

Several other aspects of LMU's conduct toward Teltronics warrant brief comment. First, the trustee assigns great significance to Halvorsen's report dated February 12, 1979 on collateral foreclosure and bankruptcy considerations. The trustee argues that this document is the blueprint for LMU's takeover scheme, and that it memorializes LMU's predatory intent. At the time Halvorsen's report was prepared Teltronics gave every indication that it would be unable to make the Nordic interest payment on February 28, 1979. *See* ¶¶ 54–90, 160–162, *supra.* Thus, it was eminently reasonable for LMU to explore its alternative courses of action in the event of a default. With one possible exception, none of the steps outlined by Halvorsen are unusual or improper creditors' remedies for default. In paragraph number 7 of the memorandum, Halvorsen states that after Teltronics was in bankruptcy, "LMU would now make arrangements to service the collateral base and other TSI [Teltronics] accounts and establish direct-selling activities in TSI's marketing area. LMU would certainly be in a position to attract the best employees from TSI to facilitate these efforts." The evidence adduced at trial demonstrates, however, that although LMU engaged in service and sales activities in Teltronics' marketing area, it intentionally avoided soliciting the former employees or customers of Teltronics, *see* ¶¶ 226–230, *supra.* Absent a showing that such competition was conducted in an unconscionable manner, the court finds no manifestation of moral turpitude.

Second, LMU is alleged to have fraudulently induced Teltronics to discourage the overtures of outside investors, *see* ¶¶ 99–

117, *supra.* While it is clear that LMU did not want Teltronics to sell substantial equity interests to Tsai or Loral, the record bears no credible evidence tending to show that Teltronics relied on any promises of LMU for increased funding in deciding to fend off the suitors. Rather, LMU at the behest of Beagan agreed merely to investigate the possibility of LMU's purchasing equity in Teltronics, and promptly informed Beagan that LME had decided not to permit such acquisition. *See* ¶¶ 101–105, 109–110, 114–116, *supra.* Moreover, no credible evidence was offered to show that a $4 million loan allegedly promised to Teltronics during this period was in fact promised. *See* ¶¶ 111–113, *supra.*

Finally, LMU encouraged Teltronics to sell a substantial equity interest to LMU at below market price in accordance with the Northeast Concept. *See* ¶¶ 118–121, *supra.* Since this proposal was never effectuated, and since the alleged sanctions employed by LMU, such as C.O.D. terms, are more directly attributable to Teltronics' large trade account balance, *see* ¶¶ 78–90, *supra,* it appears that LMU's equity negotiations were not the cause of damage sustained by Teltronics' other creditors. Accordingly, pursuant to the *Mobile Steel* test, the alleged inequitable conduct is an insufficient predicate for invoking the harsh remedy of equitable subordination.

In summary, LMU's conduct toward Teltronics does not warrant equitable subordination of LMU's claim. The relief sought in the trustee's counterclaim is therefore denied.

VII. *Plaintiff is Entitled to the Relief Sought in Its Complaint*

In accordance with the above findings of fact and conclusions of law, the plaintiff is entitled to the relief enumerated in its complaint.

Settle Judgment.